UNITED STATES of America,
Appellee,

v.

Anthony BRUNO, Angelo Cerasulo,
John Imbrieco, Defendants,

Mario Fortunato and Carmine Polito,
Defendants–Appellants,

No. 03–1349(L), 03–1351(CON).

United States Court of Appeals,
Second Circuit.

Argued: May 17, 2004.

Decided: Sept. 14, 2004.

Diarmuid White, White & White, New York, N.Y. (Brendan White of counsel; Gerald J. McMahon, Esq., New York, NY, on the briefs) for Defendant–Appellant Carmine Polito.

Paul Shechtman, Stillman & Friedman, P.C., (Sara Beth Savage, on the briefs) New York, NY, for Defendant–Appellant Mario Fortunato.

Daniel S. Dorsky, Special Assistant United States Attorney for the Eastern District of New York (Roslynn R. Mauskopf, United States Attorney, on the brief; Assistant United States Attorneys David C. James, Paul Weinstein, and Todd Harrison, of counsel), for Appellee.

Before: MINER and KATZMANN, Circuit Judges, and TSOUCALAS, Judge.*

MINER, Circuit Judge.

These appeals arise from the November 24, 1994 shootings of Genovese Crime Family associates Sabatino Lombardi and Michael D'Urso by John Imbrieco and Anthony Bruno while the victims were playing cards at a Genovese Crime Family social club. Although Lombardi was fatal- ly wounded, D'Urso survived and subsequently became a cooperating witness for the Government. Bruno, Imbrieco, and the "getaway" driver, defendant Angelo Cerasulo, later pled guilty to various crimes and agreed to cooperate with the Government. The remaining participants in the November 1994 shootings—defendants-appellants Mario Fortunato and Carmine Polito—were subsequently tried for, and convicted of, violating various federal statutes relating to the Violent Crimes in Aid of Racketeering Act ("VCAR"), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and obstruction of justice for their roles in planning these shootings and subsequently obstructing the federal investigation of the shootings by attempting to influence the testimony of two grand jury witnesses and lying to the FBI.

Of the several arguments raised by Polito and Fortunato, we find that the following have merit and decline to reach the others: (1) The RICO conspiracy, substantive RICO, and VCAR convictions (Counts I, II, and III) must be reversed for lack of legally sufficient evidence. In particular, the evidence was insufficient either to establish that Polito and Fortunato murdered Lombardi to "maintain or increase" positions in the Genovese Crime Family or to establish that the shootings of Lombardi and D'Urso were related to the activities of the Genovese Family criminal enterprise. In addition, the evidence was insufficient to establish a corrupt endeavor to influence the testimony of two grand jury witnesses. (2) Because of this latter deficiency, the convictions relating to obstruction of justice (VII and VIII) also must be reversed for lack of legally sufficient evi-

---

* The Honorable Nicholas Tsoucalas, of the United States Court of International Trade, sitting by designation.

dence. (3) The convictions relating to Cerasulo's false statements (Count V) must be reversed for lack of legally sufficient evidence under the Government's *Pinkerton* liability theory. (4) The convictions for false-statement conspiracy (included in Count IV) must be vacated because the District Court committed plain error in admitting the hearsay evidence supporting those convictions, in violation of the Confrontation Clause. (5) The convictions for conspiracy to obstruct justice (included in Count IV) must be reversed because the evidence was legally insufficient to support those convictions. (6) The convictions relating to Fortunato's false statements (Count VI) must be vacated due to spillover prejudice. And (7) the District Court improperly instructed the jury with respect to the court's authority to sentence cooperating witnesses in the absence of a § 5K1.1 letter from the Government.

Accordingly, for the reasons set forth below, we reverse the convictions under Counts I, II, III, V, VII, and VIII and for obstruction-of-justice conspiracy under Count IV; vacate the convictions for false-statement conspiracy under Count IV and the false-statements convictions under Count VI; and remand for a new trial consistent with this opinion.

## BACKGROUND

Viewing the evidence in the light most favorable to the Government, *see United States v. Wilkerson*, 361 F.3d 717, 721 (2d Cir.2004), the evidence presented at trial was as follows:

### I. *Appellants and Their Associates*

Lombardi worked at a restaurant in Little Italy, where he became acquainted with several organized crime figures, including Joe Zito. Zito was a "soldier" in the Genovese Family and led a "crew" that reported to Rosario Gangi, a Genovese Family "capo." Lombardi and D'Urso became members of Zito's crew and participants in Zito's loansharking activities.

Polito, a cousin of Lombardi, owned and operated a pizzeria in Queens. He was an inveterate gambler, who had borrowed money from Genovese Family loansharks, including Lombardi and D'Urso, and used the borrowed funds to pay his gambling debts. Zito would dispense money to Lombardi, who would loan some of it out and then pass the rest along to D'Urso, who then would loan it out to Polito, among others. Eventually, Salvatore Aparo, the acting capo to whom Zito reported after Gangi went to prison, began dispensing money directly to D'Urso for him to loan out. In addition to being a loansharking customer of Lombardi and D'Urso, Polito was "on record" with Zito because Zito had helped Polito with his gambling debts. By 1993, Polito owed hundreds of thousands of dollars to various loansharks, including approximately $70,000 to D'Urso.

Polito, D'Urso, and Lombardi regularly played cards at D'Urso's social club in Williamsburg, Brooklyn, and the three became close friends. Fortunato, another close friend of Polito, was one of the founders of Fortunato Brothers Bakery, a well-known Italian bakery in Williamsburg. Fortunato's involvement in Genovese Family affairs was largely limited to playing in high-stakes card games with Polito, Lombardi, and D'Urso at a social club located on Mulberry Street in Manhattan that was operated by Genovese Family soldier Tommy Cestaro. Lombardi had provided the necessary introductions to permit Polito and Fortunato to attend this social club. Historically, D'Urso had a poor personal relationship with Fortunato, a contemporary of D'Urso's father, and viewed Fortunato as arrogant. On several occasions, D'Urso had physically assaulted Fortunato over remarks that he had made that

D'Urso found offensive. Nevertheless, D'Urso and Fortunato continued to see each other at card games frequented by Polito.

## II. *Robbery of Chemical Bank*

For almost forty years, Fortunato had been a friend of Alfred Driano, a seventy-two-year-old vault attendant at a Manhattan branch of Chemical Bank. Some time in 1993, Fortunato introduced Driano to Polito and told Polito that Driano worked at a bank. Driano was later approached by two men who sought his assistance in robbing the bank. Driano declined and then reported the incident to Polito and Fortunato, who told him that these men were "rough guys," that he was "in deep now" and could not back out, and that he would be paid for his assistance. Shortly thereafter, the same two men again unsuccessfully attempted to enlist Driano's assistance in robbing the bank by asking him if he would open the door to the vault area of the bank when the armored truck guards arrived with a delivery of money.

On December 21, 1993, the bank was robbed, apparently without Driano's assistance. Two men with guns and masks forced their way into the vault area, struck Driano in the back with a hard object, and stole $1.5 million. After the robbery, the police recovered from the getaway van approximately $537,000 of the stolen money and a business card from the Fortunato family's bakery. Polito received about $80,000–90,000 for his role in planning the robbery.

After the robbery, Driano complained that he had not been paid. To keep Driano quiet, Gangi told D'Urso to make sure that Polito and Fortunato paid Driano off. Afterwards, Gangi and a member of his crew physically assaulted Polito at the latter's pizzeria for Polito's failure to pay Driano. Fortunato also told Driano that

Fortunato had been beaten for failing to advance Driano his share of the bank robbery money and that Fortunato had been given twenty-four hours to pay Driano. Fortunato complied by facilitating the payment of $10,000 to Driano by a third party. When Driano was subpoenaed several years later in connection with an investigation of the robbery, Fortunato told Driano to say only that he had not been involved.

In November 1995, Polito and other Genovese Family members and associates pled guilty to federal charges involving the Chemical Bank robbery, resulting in Polito spending several years in prison. Although the Government has made much of Fortunato's involvement in this robbery in order to establish that he was an associate of the Genovese Family, it is worth noting that Fortunato was never criminally charged with participating in the robbery.

## III. *Polito's Unsuccessful Attempts to Switch Crews*

Most of the participants in the Chemical Bank robbery were members of a Genovese Family crew that reported to Genovese capo "Alley Shades" Malangone. At the time of the bank robbery, Zito was trying to avoid attention from law enforcement by keeping a low profile; Zito made it known that he did not want anyone from his crew committing armed robberies. As noted above, at the time of the Chemical Bank robbery, Polito owed several hundred thousand dollars in loansharking and gambling debts and participated in the robbery to get money to pay down some of his debts.

Following the bank robbery, Polito began spending more time with members of Malangone's crew. According to D'Urso, Polito did this so that he could participate in more significant crimes, repay his outstanding gambling debts, and eventually become a "made" member of the Genovese

Family. Lombardi became angry at Polito upon learning that Polito was hanging out with Malangone's crew. But when Lombardi tried to stop Polito from hanging out with Malangone's crew, Lombardi was reprimanded by Malangone, who told Lombardi that he had no authority to tell Polito what to do because Lombardi was not a made member of the Genovese Family. Lombardi then complained to Zito, who called Malangone. Zito told Malangone that he didn't want Polito hanging out with Malangone's crew; Malangone deferred, agreeing "that he [would] stop it."

## IV. *The Shootings of Lombardi and D'Urso*

At some point during 1994, Polito and his cousin Imbrieco, an associate of the Bonnano Crime Family, asked another one of their cousins, Cerasulo, to kill D'Urso and Lombardi. According to Cerasulo, Polito told him that D'Urso and Lombardi had previously "set [Polito] up" for a robbery,[1] that Polito owed them a lot of money, and that they were "pieces of shit" who "had to go." Cerasulo testified that he agreed to participate in the murder because he "wanted to get a reputation" and that Polito had promised him that Fortunato and others would pay Cerasulo to commit the murder. Cerasulo also testified that he asked Polito if he had received permission from higher-ups in the Genovese Family to kill two Genovese associates; Cerosulo never testified as to what Polito's response was, if any. Cerasulo did testify that Fortunato provided him with one of Polito's guns to commit the murder. Cerasulo and Imbrieco later went to Lombardi's house to ambush Lombardi and D'Urso, but Cerasulo got cold feet at the last minute and aborted the mission. .

Polito subsequently asked Cerasulo to find someone else to commit the murders, so Cerasulo recruited Bruno, who was a close friend of both Cerasulo and Imbrieco and, according to the Government, an "aspiring mobster." Bruno agreed to kill D'Urso and Lombardi to enhance his standing with "connected" people—i.e., Polito and Imbrieco, whom Bruno knew to be associated with organized crime. With Bruno in on the scheme, the plan was that he and Imbrieco would do the shooting, and Cerasulo would drive the getaway car. Bruno also got cold feet, however, and when he had the opportunity, he failed to shoot Lombardi and D'Urso.

By the end of November 1994, Polito owed Lombardi about $50,000 and D'Urso about $10,000. Polito explained to his cohorts that he wanted the murders to be committed before late November to avoid repaying those debts. Three days before Polito's debt to Lombardi was due, D'Urso was playing cards at a Genovese Family social club. The door to the club was locked from the inside to prevent uninvited persons from entering the club. Polito and Fortunato later joined the game and suggested that D'Urso invite Lombardi as well. Lombardi eventually arrived. Imbrieco, Bruno, and Cerasulo arrived still later (around midnight).

Just before the shooting began, Lombardi and D'Urso were seated next to each other, with Imbrieco and Bruno standing directly behind them. At some point during the card game, Bruno pulled out his gun, placed it to the back of D'Urso's head, and fired. Cerasulo then ran out of the club to start the car, while Bruno and Imbrieco began shooting at Lombardi.

---

1. This is a reference to a 1993 armed robbery that took place at D'Urso's social club while D'Urso, Polito, and others were playing cards. In the course of the robbery, $700 was stolen and Polito was shot in the leg. According to D'Urso, Polito believed that D'Urso had been behind the robbery.

Lombardi subsequently died from his gunshot wounds, but D'Urso eventually recovered.

Immediately after the shootings, Polito and Fortunato ran out of the club. Bruno and Imbrieco followed them and joined Cerasulo in the getaway car. Cerasulo drove Bruno and Imbrieco to an automobile impound yard in Greenpoint, Brooklyn, where they abandoned the car. Polito later picked them up and drove to a diner in Queens. Fortunato walked home and went to bed.

## V. *The Events Following the Shootings and the Belated Grand Jury Investigation*

Hours after the shootings, Fortunato told several people, including NYPD detectives, that he had left the club before the shootings occurred. But, after learning that D'Urso had survived, Fortunato admitted that he had been at the club when the shootings occurred, but maintained that he had not actually witnessed who fired the shots. He stuck with this story, telling it both to the local police investigating the shootings and, years later, to the FBI when he was arrested in January 2002.

All the participants in the shootings decided to lay low out of fear that D'Urso would retaliate against them. Imbrieco, Polito, and Cerasulo drove to Long Island City to meet with Fortunato. They then drove to Manhattan in Fortunato's car to pick up Bruno. The cabal then drove to New Jersey to formulate a plan. On the way to New Jersey, Polito told Bruno that "we are all together now. Just calm down." According to Cerasulo, they agreed "to stick together" and not "tell nobody who did nothing." During the drive, Polito and Fortunato discussed trav-

eling to Italy, while the other three men planned to go to Florida. Polito and Fortunato dropped off the others at a train station, where they boarded a train bound for North Carolina. A few days later, however, the three men returned to New York City by bus, intending to hide. Although Polito had no intention of attending Lombardi's wake or funeral, Zito and Aparo ordered Fortunato to attend the services. The three conspirators were interviewed by local police in December 1994. Each of the three denied doing the shootings and claimed not to have seen the shooters—notwithstanding the fact that the three were the only individuals in the locked, private social club with Lombardi and D'Urso that night, and the only ones to emerge unscathed.

After the shootings, Fortunato sought protection from Genovese Family capo "Tough Tony" Federici against any retaliation by D'Urso. Polito once again began hanging out with Malangone's crew. At one point, Gangi attempted to get permission from higher-ups in the Genovese Family for D'Urso to kill Polito, but Malangone successfully intervened on Polito's behalf, and D'Urso was told not to retaliate. After Aparo became acting capo, he was told by his superiors that, if anything happened to Polito, Aparo would be held personally responsible. D'Urso ignored these warnings, however, and hired someone in an unsuccessful attempt to kill Polito.

In June 1998 (while Polito was still incarcerated pursuant to his Chemical Bank robbery guilty plea), D'Urso began cooperating with the Government and wearing a wire to record his conversations with several organized crime members, including Aparo.[2] In one of those recorded conversations, Aparo told D'Urso that Malangone

**2.** As discussed below, the contents of some of these tape recordings were introduced at the trial giving rise to this appeal, in conjunction with D'Urso's testimony on behalf of the Gov-

had attempted to "release" Polito to a crew in the Luchese Crime Family, but that Aparo had vetoed this attempt because Polito "belonged" to Aparo.

In January 2001—more than six years after the shootings—Fortunato's brother, Michael Fortunato ("Michael"), received a federal grand jury subpoena and was told by the FBI that Fortunato was being investigated for the 1993 Chemical Bank robbery. According to Michael's grand jury testimony, shortly after he was subpoenaed, he told Fortunato that the FBI claimed that Fortunato had been involved in the Chemical Bank robbery and was likely to be arrested. Fortunato responded: "[L]et them do whatever they want to do. I have nothing to do with anything." Michael also testified that Fortunato told him that he did not remember anything about the night of Lombardi's murder and that Fortunato had fallen down because "maybe" somebody had pushed him when the shooting began. Thus, Fortunato denied to Michael having seen who shot Lombardi.

In October 2001, Cerasulo's father, Giuseppe Cerasulo ("Giuseppe"), also was subpoenaed to testify before the grand jury. Cerasulo testified at trial that, in late 1994, he told Giuseppe that he had not seen who did the shootings. Cerasulo was present when the FBI served the grand jury subpoena on Giuseppe, and at that time Cerasulo told the agents that he had not witnessed who shot Lombardi and D'Urso.

## VI. *Arrests, Indictment, Guilty Pleas, and Trial*

After their arrests in 2002 for Lombardi's murder, Polito told Cerasulo that they all had to "stick together." During a prison conversation that took place after Polito had expressed concern about whether Bruno would begin cooperating with the Government, Polito told Cerasulo that Polito would supply Bruno with an attorney. After this conversation, an attorney came to visit Bruno and told him that she had been sent by Polito and that her fee had been paid; Bruno declined to retain her. Fortunato also unsuccessfully offered to hire a lawyer for Bruno. In June or July 2002, Bruno pled guilty to murder in aid of racketeering pursuant to a cooperation agreement. After testifying for the Government at the trial of Polito and Fortunato, Bruno was sentenced to ten years' imprisonment.

In August 2002, the remaining four conspirators were charged by a federal grand jury in an eight-count superseding indictment. Count I charged all four defendants with "racketeering conspiracy"—i.e., violating the RICO statute by conspiring to commit the predicate racketeering acts enumerated in Count II. Count II charged Fortunato and Cerasulo with "racketeering"—conducting the affairs of the Genovese Family enterprise through a pattern of racketeering activities, consisting of five predicate acts ("Racketeering Acts One through Five"): (1) conspiring to murder Lombardi and D'Urso, (2) murdering Lombardi, (3) attempting to murder D'Urso, (4) corruptly endeavoring to influence Michael's grand jury testimony, and (5) conspiring to rob, and robbing, the Chemical Bank branch.[3] Count III charged all four defendants with the mur-

---

ernment. Because we are reversing the RICO and VCAR convictions, we decline to address Polito's and Fortunato's argument that the District Court abused its discretion in admitting the hearsay statements in these tape recordings under either Fed.R.Evid.

801(d)(2) (coconspirator statements) or Fed. R.Evid. 804(b)(2) (declarations made against penal interest).

**3.** The indictment redacted the names of Giuseppe Cerasulo and Michael Fortunato, refer-

der of Lombardi as a violent crime in aid of racketeering.

Count IV charged all four defendants with conspiring to (i) obstruct justice and (ii) make false statements in connection with the substantive crimes charged in Counts V through VIII. Count V charged all four defendants with Cerasulo's false statement to the FBI that he did not know who did the shootings.[4] Count VI charged all four defendants with Fortunato's false statement to the FBI that he, too, did not know who did the shootings. Count VII charged all four defendants with Cerasulo's obstruction of justice in trying to influence Giuseppe's grand jury testimony. And Count VIII charged all four defendants with Fortunato's obstruction of justice in trying to influence Michael's grand jury testimony. The indictment also sought forfeiture of $1.6 million and certain other assets.

On September 26, 2003, Cerasulo pled guilty to murder in aid of racketeering pursuant to a cooperation agreement. After testifying for the Government at the trial of Polito and Fortunato, Cerasulo was sentenced to ten years' imprisonment. On January 10, 2003, Imbrieco pled guilty to RICO conspiracy and conspiracy to defraud the Government by making false statements and obstructing justice, pursuant to a plea agreement that promised him a twenty-year sentence. Although Imbrieco did not testify at the trial of Polito

and Fortunato, excerpts from the transcript of his plea allocution were read to the jury. In those excerpts, Imbrieco admitted that: (i) he had conspired with Cerasulo and Fortunato to murder Lombardi and D'Urso; (ii) he had conspired with Fortunato, Polito, and Cerasulo to make false statements to the FBI and influence the testimony of grand jury witnesses; and (iii) an effort was made to influence the grand jury testimony of Giuseppe.

On January 28, 2003, after a ten-day trial, the jury convicted Polito and Fortunato on all counts charged in a redacted superseding indictment[5] and returned a forfeiture finding of $275,000. On June 6, 2003, Polito and Fortunato were sentenced principally to life imprisonment and ordered to forfeit $275,000 (jointly and severally). These timely appeals followed.

## DISCUSSION

I. *Admission of Imbrieco's Plea Allocution and Michael Fortunato's Grand Jury Testimony*

We turn first to whether the District Court's admission of two hearsay statements—Imbrieco's plea allocution and Michael's grand jury testimony—violated the Confrontation Clause of the Sixth Amendment in light of the Supreme Court's recent decision in *Crawford v. Washington*, — U.S. ——, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).[6] There, the Court held that

---

ring to them, respectively, as "John Doe 1" and "John Doe 2."

4. As discussed in more detail below, Polito and Fortunato could be held criminally liable for their coconspirator Cerasulo's subsequent criminal conduct under the Supreme Court's decision in *Pinkerton v. United States*, 328 U.S. 640, 646–48, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), if the Government could establish that (i) Cerasulo's criminal conduct had been committed in furtherance of the alleged conspiracy among the three of them to ob-

struct justice and make false statements, and (ii) Cerasulo's criminal conduct reasonably could have been foreseen by them as a consequence of the alleged conspiracy.

5. The redacted superseding indictment deleted all references to the defendants who had pled guilty.

6. In light of our conclusion that the admission of these hearsay statements violated the Confrontation Clause, we decline to reach the subsidiary arguments of Polito and Fortunato

the Confrontation Clause was violated when the state trial court admitted a statement made by the defendant's wife to the police, notwithstanding the wife's unavailability to testify at trial due to the invocation of the marital privilege. Specifically, the Court held that "[t]estimonial statements of witnesses absent from trial [are to be] admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Id.* at 1369. In reaching this conclusion, the Court identified earlier lower federal court cases where testimonial statements had been admitted in contravention of its interpretation of the Confrontation Clause, including cases where a "plea allocution show[ed][the] existence of a conspiracy," *id.* at 1372 (citing, inter alia, *United States v. Dolah*, 245 F.3d 98, 104–05 (2d Cir.2001)), and cases involving the admission of grand jury testimony, *see id.* (citing, inter alia, *United States v. Papajohn*, 212 F.3d 1112, 1118–20 (8th Cir. 2000)).

In a letter brief submitted pursuant to Fed. R.App. P. 28(j), the Government does not dispute the applicability of *Crawford* to the admission of Imbrieco's plea allocution and Michael's grand jury testimony; there is no question that both hearsay statements were testimonial statements made by declarants (a) who were unavailable to testify at the time that their hearsay statements were admitted into evidence, and (b) whose hearsay statements were not subject to cross examination by the defendants at the time the statements were made. Instead, the Government argues that our review is limited to plain error because (i) no Confrontation Clause objection was raised to the admission of Imbrieco's plea allocution, and (ii) the only

Confrontation Clause objection to the admission of Michael's grand jury testimony was made in a footnote contained in a letter brief to the District Court. *See United States v. Dukagjini*, 326 F.3d 45, 60 (2d Cir.2002) ("We adhere to the principle that, as a general matter, a hearsay objection by itself does not automatically preserve a Confrontation Clause claim."). For the reasons set forth below, we find that the admission of these hearsay statements was plain error, and we exercise our discretion to vacate the convictions with respect to the false-statement conspiracy charged in Count IV.

 "[B]efore an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affects substantial rights." *Johnson v. United States*, 520 U.S. 461, 466–67, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) (internal quotation marks omitted). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *Id.* (internal quotation marks omitted); *see also* Fed.R.Crim.P. 52(b). Here, it cannot be gainsaid that the District Court plainly erred in admitting into evidence testimonial hearsay statements that the *Crawford* Court expressly stated are not admissible under the Confrontation Clause. We hasten to observe that the able District Court made its rulings before the Supreme Court issued *Crawford,* and that only a soothsayer could have known with any certainty that the Court would change the legal landscape. That these statements were clearly admissible under

---

that (i) the District Court abused its discretion in admitting Imbrieco's plea allocution under Fed.R.Evid. 804(b)(3) as a statement against Imbrieco's penal interest; and (ii) the District

Court abused its discretion in admitting Michael's grand jury testimony under the "residual" or "catchall" hearsay exception contained in Fed.R.Evid. 807.

our interpretation of the Confrontation Clause at the time they were admitted is of no moment, however, given that "[a]n error is 'plain' if it is 'clear' or 'obvious' at the time of *appellate consideration.*" *United States v. Thomas,* 274 F.3d 655, 667 (2d Cir.2001) (en banc) (emphasis added) (quoting *Johnson,* 520 U.S. at 467–68, 117 S.Ct. 1544).

■ Next, we conclude that this error affected the substantial rights of Polito and Fortunato. The Supreme Court has identified two kinds of errors that substantially affect a defendant's rights. The first class of errors are "structural" errors, that is, a "defect affecting the framework within which [a] trial proceeds, rather than simply an error in the trial process itself." *Arizona v. Fulminante,* 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). These structural errors are "so serious" that they "defy harmless-error analysis," and thus have been found by the Supreme Court in "only ... a very limited class of cases." *Johnson,* 520 U.S. at 468–69, 117 S.Ct. 1544.[7] To date, the Supreme Court has not held that the Confrontation Clause error raised here is one of those cases.

■ With regard to all other errors, such an error "affects a defendant's substantial rights if it is prejudicial and it affected the outcome of the district court proceedings." *Thomas,* 274 F.3d at 668 (internal quotation marks omitted). "Though prejudice is also required to show that an error is not harmless, pursuant to Fed.R.Crim.P. 52(a), the important difference of plain error prejudice [in most cases] is that it is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice." *Id.* (internal quotation marks omitted; alteration in original).[8] Because we find that the admission of these hearsay statements fails to satisfy the more exacting test applicable to "non-structural" errors, we need not—and do not—decide whether the District Court's error in admitting these statements was a structural error that would not require a finding of prejudicial effect.

■ "The erroneous admission of evidence is not harmless unless [we] can conclude with fair assurance that [this] evidence did not substantially influence the jury." *United States v. Jean–Baptiste,* 166 F.3d 102, 108 (2d Cir.1999); *see Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). "An error in the admission of evidence may be deemed harmless only if it is highly probable that the error did not contribute to the verdict." *Jean–Baptiste,* 166 F.3d at 108 (internal quotation marks

7. *See, e.g., Sullivan v. Louisiana,* 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (erroneous reasonable doubt instruction to jury); *Vasquez v. Hillery,* 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986) (unlawful exclusion of grand jurors of defendant's race); *Waller v. Georgia,* 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) (right to a public trial); *McKaskle v. Wiggins,* 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984) (right to self-representation at trial); *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (total deprivation of right to counsel); *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (lack of impartial trial judge).

8. "When, as here, the source of the alleged error is a supervening judicial decision that alters 'a settled rule of law in the circuit,' we have in the past applied a 'modified plain error rule' in which the Government bears the burden of persuasion as to whether substantial rights have been affected." *Thomas,* 274 F.3d at 668 n. 15 (quoting *United States v. Santiago,* 238 F.3d 213, 215 (2d Cir.2001)). We need not decide whether the Supreme Court's decision in *Johnson* implicitly overruled our modified plain error rule because, as discussed below, the defendants here prevail under ordinary plain error review.

omitted). "In making this determination, we consider principally whether the [G]overnment's case against the defendant[s] was strong; whether the evidence in question bears on an issue that is plainly critical to the jury's decision . . .; whether the evidence was emphasized in the [G]overnment's presentation of its case and in its arguments to the jury; and whether the case was close." *Id.* at 108–09 (internal quotation marks and citations omitted).

■ We cannot conclude with fair assurance that the admission of Imbrieco's plea allocution and Michael's grand jury testimony did not substantially influence the jury's guilty verdict. *Cf. United States v. McClain,* 377 F.3d 219, 2004 WL 1682768, at *3 (2d Cir. July 28, 2004) (finding that the erroneous admission of the co-conspirators' testimonial plea allocutions was harmless error "beyond a reasonable doubt"). Indeed, Michael's grand jury testimony was the only evidence offered to support the charge that Fortunato had corruptly endeavored to influence Michael's grand jury testimony, and, thus, this testimony formed the entire basis for the obstruction-of-justice violation alleged in Count VIII and for Racketeering Act Four in Count II. Plainly, then, the admission of this testimony contributed to the jury's conclusion that Fortunato committed these offenses. In any event, even were we to deem Michael's grand jury testimony admissible, for the reasons discussed below, the evidence was insufficient to support the defendants' convictions under Counts II and VIII (*see* discussion *infra* Parts II.B and II.C.1, respectively), which, therefore, are reversed instead of vacated.

■ Imbrieco's plea allocution was also offered to establish the false-statement and obstruction-of-justice conspiracies charged in Count IV. One of the elements of a conspiracy to obstruct justice or to defraud the government is, of course, an agreement to do so. *See United States v. Ballistrea,* 101 F.3d 827, 832 (2d Cir.1996); *see also United States v. Schwarz,* 283 F.3d 76, 105–06 (2d Cir.2002). Here, the only evidence that an illegal agreement existed, either to make false statements or to obstruct justice, was (i) Imbrieco's plea allocution, and (ii) Cerasulo's testimony that, shortly after the shootings, the defendants agreed "to stick together" and not "tell nobody who did nothing." As discussed below, however, *see* discussion *infra* Part II.C., Cerasulo's testimony alone is insufficient to establish an agreement either to make false statements to the FBI or to obstruct justice by corruptly endeavoring to influence the grand jury testimony of Giuseppe and/or Michael. Thus, it is clear that the admission of Imbrieco's plea allocution contributed to the jury's conclusion that Polito and Fortunato conspired to obstruct justice and to make false statements to the FBI.

■ Because there was plain error and because that error affected the substantial rights of Polito and Fortunato, we turn to the fourth prong of the plain-error test—whether we should exercise our discretion to notice the plain error. "We are permitted to exercise our discretion to notice a plain error only when the error 'seriously affect[ed] the fairness, integrity *or* public reputation of judicial proceedings.' " *Thomas,* 274 F.3d at 671 (emphasis added) (quoting *United States v. Olano,* 507 U.S. 725, 736, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). We find that the fairness and integrity of the proceedings in this case were seriously affected by the unconstitutional admission of these hearsay statements.

■ Here, as we discuss in more detail below, the evidence supporting the defendants' convictions was, with respect to most of the counts charged in the indictment, legally insufficient. Indeed, some of

the convictions are supported by quanta of evidence that are *deemed* "legally sufficient" only because, in assessing a legal-sufficiency challenge, we must consider improperly admitted hearsay testimony.[9] And the only count that is supported by properly admitted, legally sufficient evidence (Count VI) relates to the cover-up of acts for which we find Polito and Fortunato were not criminally liable as charged. It is also notable that, but for the inclusion of the obstruction-of-justice predicate act, the substantive RICO charges, at least, would be time-barred by the applicable five-year statute of limitations.[10] Allowing these "cover-up" convictions to stand based solely on unconstitutionally inadmissible hearsay testimony would indeed lead to a result that would seriously call into question the fairness and integrity of these proceedings. For all of these reasons, we exercise our discretion to notice the plain error of the District Court in admitting the hearsay testimony of Michael and Imbrieco, and we vacate the convictions for false-statement conspiracy under Count IV of the indictment.[11]

## II. *Sufficiency of the Evidence*

### A. *Appellants' Arguments*

Both defendants challenge the legal sufficiency of the evidence supporting all counts except Count VI, the count relating to false statements that Fortunato made to an FBI agent. First, defendants argue that the evidence underlying the VCAR and RICO counts relating to the murder of Lombardi, the attempted murder of D'Urso, and the conspiracy to murder Lombardi and D'Urso (collectively, the "Shootings") was legally insufficient to establish that Polito and Fortunato committed the charged racketeering acts to "maintain or increase" positions in the Genovese Crime Family, or to establish that these offenses were related to the activities of the Genovese Family enterprise. Second, defendants argue that the evidence underlying the charged conspiracy to obstruct justice was legally insufficient because, when they decided to "stick together" shortly after the Shootings took place, it was not reasonably foreseeable that a federal grand jury would be empaneled. And third, defendants argue that the evidence underlying the substantive obstruction-of-justice and false-statement counts was legally insufficient.

As a preliminary matter, the logical implications of these arguments require some explication. First, if the Shootings were not committed to maintain or increase the

---

**9.** See *United States v. Cruz*, 363 F.3d 187, 197 (2d Cir.2004); *see also infra* note 20.

**10.** A substantive RICO count is time-barred where the defendant has not committed at least one predicate racketeering act within five years of the date of the indictment. 18 U.S.C. § 3282(a); *see United States v. Zvi*, 168 F.3d 49, 54 (2d Cir.1999). Here, all but one of the five enumerated racketeering acts charged in the original indictment were committed outside the limitations period. Only Racketeering Act Four, which charged the obstruction-of-justice conspiracy between December 2000 and January 25, 2001, occurred within the limitations period. A RICO conspiracy, however, "is presumed to exist until there has been an affirmative showing that it has been terminated[;] and its members continue to be conspirators until there has been an affirmative showing that they have withdrawn." *United States v. Spero*, 331 F.3d 57, 60 (2d Cir.2003); *see United States v. Salerno*, 868 F.2d 524, 534 & n. 4 (2d Cir.1989). Here, because we reverse the RICO conspiracy convictions on other grounds, we do reach the issue, as we did not in *Spero*, of what implications a defendant's continued membership in an ongoing organized crime family may have on the statute of limitations for a RICO conspiracy charge.

**11.** We take a different tack with the convictions for obstruction-of-justice conspiracy under Count IV. *See* discussion *infra* Part II. C.1.a.

defendants' positions in the Genovese Family, then the convictions of the defendants under Count III (murder in aid of racketeering) must be reversed. Second, if the Shootings were not related to the activities of the Genovese Family, then three of the five predicate racketeering acts enumerated in Count II are legally insufficient. And third, if, in addition, the evidence was legally insufficient to support the obstruction-of-justice predicate act (i.e., Fortunato's allegedly corrupt efforts to influence Michael's grand jury testimony), then the RICO convictions cannot be affirmed, because the only predicate act remaining in the indictment—the robbery of, and conspiracy to rob, Chemical Bank—would be insufficient to establish a "pattern of racketeering activity," which must include at least two predicate racketeering acts within ten years of each other. See Diaz, 176 F.3d at 93. Accordingly, the survival of the RICO convictions depends not only on the sufficiency of the evidence relating to the Shootings, but also on the sufficiency of the evidence relating to obstruction of justice by attempting to influence Michael' grand jury testimony.

■■■■ The standard under which we review a challenge to the sufficiency of the evidence in a criminal trial is familiar:

> A defendant challenging a conviction based on a claim of insufficiency of the evidence bears a heavy burden. The evidence presented at trial should be viewed in the light most favorable to the [G]overnment, crediting every inference that the jury might have drawn in favor of the [G]overnment. We consider the evidence presented at trial in its totality, not in isolation, but may not substitute our own determinations of credibility or relative weight of the evidence for that of the jury. We defer to the jury's determination of the weight of the evidence and the credibility of the wit-

nesses, and to the jury's choice of the competing inferences that can be drawn from the evidence. Accordingly, we will not disturb a conviction on grounds of legal insufficiency of the evidence at trial if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

United States v. Dhinsa, 243 F.3d 635, 648–49 (2d Cir.2001) (citations and internal quotation marks omitted). Finally, "[i]n situations where some [G]overnment evidence was erroneously admitted, we must make our determination concerning sufficiency taking into consideration even the improperly admitted evidence." Cruz, 363 F.3d at 197 (citations omitted). With this deferential standard of review in mind, we turn to the arguments of Polito and Fortunato regarding the sufficiency-of-evidence issue.

### B. Legal Sufficiency of the Evidence Relating to the Shootings

Polito and Fortunato first argue that, when viewed in the light most favorable to the Government, the evidence was not legally sufficient (i) to establish that they murdered Lombardi to maintain or increase their positions in the Genovese Crime Family; and (ii) to establish that the Shootings were related to the activities of the Genovese Family enterprise.

### 1. "Maintaining or Increasing Position" Element of Murder in Aid of Racketeering

■■■■ To convict a defendant of murder in aid of racketeering, the Government must prove that he committed the charged racketeering acts "for the purpose of gaining entrance to or maintaining or increasing [his] position" in a racketeering enterprise, here the Genovese Crime Family. See 18 U.S.C. § 1959(a). "In defining the scope of conduct satisfying the position-related motivation requirement . . ., we do not write on a blank slate." Dhinsa, 243

F.3d at 671. "Although [§ ] 1959(a) does not define the phrase 'for the purpose of ... maintaining or increasing [a defendant's] position in an enterprise,' we interpret that phrase by its plain terms, giving the ordinary meaning to its terms." *Id.* (citation omitted) "Thus, on its face, [§ ] 1959 encompasses violent crimes intended to preserve [a] defendant's position in [an] enterprise or to enhance his reputation and wealth within that enterprise." *Id.* (emphasis omitted). And the "maintaining or increasing position" language in § 1959 "should be construed liberally." *United States v. Rahman,* 189 F.3d 88, 127 (2d Cir.1999).

■ Moreover, as we explained in our recent decision in *U.S. v. Pimentel,* "the Government is not required to prove that maintaining or increasing [a defendant's] position in the RICO enterprise was the defendant's sole or principal motive. Rather, we have consistently held that the motive requirement is satisfied if the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." 346 F.3d 285, 295–96 (2d Cir. 2003) (internal quotation marks omitted; alteration in original).[12]

For example, we have affirmed racketeering convictions when: (i) the charged racketeering acts were committed or sanctioned by high-ranking members of an enterprise to protect the enterprise's operations and to advance the objectives of the enterprise; and, similarly, (ii) where one or more leaders of an enterprise committed the charged racketeering acts in response to a threat posed to the enterprise and to prevent the leaders' positions within the enterprise from being undermined by that threat.[13] On the other hand, we have reversed or vacated defendants' racketeering convictions in cases where the evidence showed that the murders (or other racketeering acts) were "purely mercenary," *Thai,* 29 F.3d at 818, and in cases where the defendant was neither a member of the enterprise nor involved in its criminal activities.[14]

### 2. Relatedness of RICO Predicate Acts

■ Turning to the RICO statute, the Government is required to show, inter

12. *See United States v. Ferguson,* 246 F.3d 129, 134 (2d Cir.2001); *Dhinsa,* 243 F.3d at 671; *Rahman,* 189 F.3d at 126; *Diaz,* 176 F.3d at 94–95; *United States v. Reyes,* 157 F.3d 949, 955 (2d Cir.1998); *United States v. Polanco,* 145 F.3d 536, 540 (2d Cir.1998); *United States v. Malpeso,* 115 F.3d 155, 164 (2d Cir.1997); *United States v. Thai,* 29 F.3d 785, 817 (2d Cir.1994); *United States v. Rosa,* 11 F.3d 315, 340–41 (2d Cir.1993); *United States v. Concepcion,* 983 F.2d 369, 381 (2d Cir.1992).

13. *See, e.g., Pimentel,* 346 F.3d at 296 (defendant gang leader ordered murder of fellow gang member to prevent victim from challenging defendant's leadership position); *Dhinsa,* 243 F.3d at 672 (racketeering acts committed by defendant, the leader of the enterprise, to silence both victims, who were believed to be cooperating with the Govern-

ment and who posed a threat to the enterprise's operations and defendant's leadership); *Diaz,* 176 F.3d at 95–96 (defendant sanctioned murders of both rival drug dealer and suspected informant to protect drug gang's territory and to maintain defendant's leadership position in the gang).

14. *See, e.g., Ferguson,* 246 F.3d at 135–36 (defendant was "an outside hit man who did not belong to or seek to join" the drug gang and who did not participate in the gang's "core activities of drug sales, extortion or robbery"); *Polanco,* 145 F.3d at 540 (defendant was not a member of the drug gang but merely someone who sold guns to the gang that were used to commit the charged racketeering acts); *Thai,* 29 F.3d at 818 (defendant participated in the charged racketeering activities solely for monetary compensation).

alia, "that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. N.W. Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) (emphasis omitted). To establish. that the predicate acts are related, the Government must show that the racketeering acts relate both to one another and—of significance here—to the enterprise. *See Polanco*, 145 F.3d at 541; *United States v. Minicone*, 960 F.2d 1099, 1106 (2d Cir. 1992); *accord United States v. Corrado*, 227 F.3d 543, 554 (6th Cir.2000). Relatedness between the racketeering acts and the enterprise can be proven by showing either that: (i) the offense related to the activities of the enterprise, or (ii) the defendant was able to commit the offense solely because of his position in the enterprise. *Minicone*, 960 F.2d at 1106; *accord United States v. Miller*, 116 F.3d 641, 676 (2d Cir.1997). Moreover, it is not necessary that the offense be in furtherance of the enterprise's activities for the offense to be related to the activities of the enterprise. *Miller*, 116 F.3d at 676.

We next examine the evidence relating to the involvement of Polito and Fortunato in the Shootings, in light of the foregoing legal analysis.

### 3. *Polito*

 As discussed above, the evidence established that Polito had several motivations for wanting to kill Lombardi and D'Urso: Polito owed them significant amounts of money from loansharking; he believed that D'Urso had previously "set him up" for a robbery; and he wanted to switch from Zito's crew to Malangone's crew to increase his chances of securing ill-gotten gains. The Government argues on appeal that it was this last motivation that satisfied the "position related" element of § 1959. The Government's argument is

fatally flawed for several reasons, however. First, it cites no authority—and we have found none—for the proposition that an associate of an organized crime family switching from one crew to another is per se evidence of maintaining or increasing his position in a criminal enterprise. Absent any such authority, we think it simply too tenuous to conclude that switching from a temporarily less active crew to a more active crew within the same organized crime family was likely to result in Polito maintaining or advancing his position in that enterprise.

Second, even when the evidence is construed in the light most favorable to the Government, no rational juror could conclude that killing Lombardi and/or D'Urso would have resulted in Polito's being able to switch crews. Polito was not a made member of the Genovese Family; nor was he acting on the orders of a made member (or anyone else) in that organization. Polito was merely an associate of the Genovese Family whose principal ties to that organization were in his capacity as a gambling and loansharking customer. Lombardi and D'Urso also were associates and not made members of the Genovese Family. Thus, the Government failed to establish through the conclusory, uncorroborated, biased, and illogical testimony of D'Urso how the killing of Lombardi and/or D'Urso would have resulted in Zito or Aparo "releasing" Polito so that he could switch crews. Nor was there any evidence that Malangone, to whose crew Polito desired to switch, had authorized the Shootings, nor that Polito would have been accepted by Malangone into his crew after the Shootings. Thus, even crediting D'Urso's testimony that Polito wanted to switch to Malangone's temporarily "more active crew," there is no evidence from which a rational juror could conclude that Polito participated in the murder of Lombardi

and the attempted murder of D'Urso to enable him to switch crews.

Third, there was significant evidence that Polito's shooting of Lombardi and D'Urso was done in contravention of Genovese Family protocols and that Polito's role in the Shootings actually *decreased* his standing in the Genovese Family. Instead of taking credit for the Shootings as a badge of honor, the participants laid low and denied any involvement in the Shootings. In fact, tape-recorded conversations between D'Urso and Aparo that were made years after the Shootings showed that higher-ups in the Genovese Family considered killing Polito for organizing the Shootings without proper authorization, but then decided against doing so out of fear that Polito would start cooperating with the Government if he found out they were planning to kill him. In sum, no rational juror could have found that Polito participated in the Shootings to maintain or increase his position in the Genovese Family.

 With respect to the "relatedness" element under RICO, *see Minicone*, 960 F.2d at 1106, we conclude that no rational juror could have found that Polito was able to arrange the Shootings "solely by virtue of his position" in the Genovese family. It is undisputed that Cerasulo and Imbrieco were Polito's cousins and that Bruno was recruited by his friend Cerasulo. As noted above, none of the shooters was a made member of the Genovese Family; nor were the Shootings themselves sanctioned by the family. Indeed, all evidence suggests otherwise. On the other hand, it is entirely reasonable to conclude that Polito planned the Shootings to avoid repaying his loansharking debts and because he despised D'Urso—in other words, that for Polito the murder of Lombardi and the attempted murder of D'Urso were simply personal matters. Accordingly, based on

the evidence adduced, we conclude that no rational juror could have found the Shootings to be related to the activities of the Genovese Family.

### 4. *Fortunato*

 The evidence concerning Fortunato's role in the Shootings was even weaker than the evidence against Polito. As discussed above, Fortunato's involvement in Genovese Family affairs consisted of a limited role in the 1993 Chemical Bank robbery, regularly playing cards with Polito and other Genovese associates at a Genovese Family social club, being a close friend of Polito's, and being an extortion victim who paid protection money for his bakery. Indeed, the only evidence concerning Fortunato's motivation for participating in the Shootings is that he hated D'Urso, who had a history of beating him up.

According to the Government, "Fortunato could expect that the [Shootings] would enhance his standing in the Genovese [F]amily simply because of his close relationship with Polito." Thus, this argument necessarily depends on our concluding that the evidence concerning Polito's role in the Shootings was legally sufficient to support a RICO and VCAR conviction. But as we have rejected this argument with respect to Polito, so too we reject it with respect to Fortunato.

 Finally, we find no evidence in the record showing that Fortunato's role in the Shootings was related to the activities of the Genovese Family or that he was able to facilitate the Shootings solely because of his position in the Genovese Family. Indeed, it is a close question whether Fortunato was even a member of Zito's crew, let alone an associate of the Genovese Family, notwithstanding D'Urso's biased and incredible testimony that such was the case.

In light of all the foregoing, we conclude that the evidence was legally insufficient to establish either RICO or VCAR liability on the part of either Polito or Fortunato for the Shootings. Accordingly, we reverse the convictions under Count III in the indictment (which related exclusively to the Shootings themselves). But for the fact that the predicate racketeering acts enumerated in the indictment also included an obstruction-of-justice offense, we could dispose of Counts I and II on the same basis as Count III. But because those counts—and, indeed, all of the remaining counts in the indictment—also charged the defendants with crimes relating to the defendants' efforts to cover up their roles in the Shootings, we must examine the legal sufficiency of the evidence of those "cover-up" crimes, to which we now turn our attention.

C. *Legal Sufficiency of the Evidence That Polito and Fortunato Obstructed Justice, Made False Statements, and Conspired to Obstruct Justice and Make False Statements*

The defendants argue that the evidence was legally insufficient to support their convictions for obstruction of justice, making a false statement to the FBI, and conspiring to defraud the Government by committing both of these offenses. For the reasons set forth below, we conclude that the evidence was legally insufficient to support the convictions relating to the conspiracies to obstruct justice charged in Counts I and IV; the obstructions of justice charged in Count II, VII, and VIII; and the false statements of Cerasulo charged in Count V.[15] We find, however, that the evidence (i) would be legally sufficient, had all of that evidence been properly admitted, to support the conviction of the defendants for the false-statement conspiracy charged in Count IV and (ii) was legally sufficient to support the conviction of the defendants for the false statements of Fortunato charged in Count VI—i.e., telling the FBI that he did not see who shot Lombardi and D'Urso. Nevertheless, we vacate (i) the convictions for false-statement conspiracy under Count IV, for the improper admission of Imbrieco's plea allocution and Michael's grand jury testimony, as discussed in Part I, *supra,* and (ii) the convictions under Count VI for the reasons discussed below.

1. *Conspiracy to Obstruct Justice and Obstruction of Justice*

■ "A conspiracy to defraud under [18 U.S.C. § 371] embraces any conspiracy for the purpose of impairing, obstructing, or defeating the lawful function of any department of government." *Ballistrea,* 101 F.3d at 831 (internal quotation marks omitted). As discussed above, the evidence that the defendants conspired to obstruct justice and obstructed justice was that, shortly after the Shootings, they agreed on a cover story to tell the authorities investigating the Shootings and continued to stick to this cover story even after a federal grand jury was empaneled years later. Section 1503 of Title 18 of the United States Code provides, in relevant part, that it is a crime to "corruptly . . . endeavor[ ] to influence, obstruct, or impede, the due administration of justice." 18 U.S.C. § 1503(a).

Preliminarily, we note that Polito and Fortunato argue on appeal that the obstruction-of-justice charges should have

---

**15.** Because we reverse the RICO convictions on the ground that the Government failed to prove at least two predicate racketeering acts, we need not reach the arguments of Polito and Fortunato that the RICO counts must also be reversed because the remaining predicate act is time-barred.

been dismissed by the District Court because they should have been brought under the federal witness tampering statute, 18 U.S.C. § 1512, instead of the obstruction-of-justice statute, 18 U.S.C. § 1503. In making this argument, the defendants rely on our decision in *United States v. Masterpol*, 940 F.2d 760 (2d Cir.1991), where we held that in enacting § 1512 Congress implicitly removed witness tampering from the scope of § 1503. The District Court concluded that the defendants had waived this argument by having failed to raise it in a pretrial motion to dismiss the indictment. On appeal, the Government asks us to affirm the District Court's waiver analysis or, alternatively, to overrule our decision in *Masterpol* (whose reasoning has been rejected by every other federal court of appeals that has considered the issue). We decline to reach these arguments, given our conclusion below that the evidence supporting the obstruction-of-justice convictions is legally insufficient.

### a. *Conspiracy to Obstruct Justice*

To secure a conviction for conspiracy to obstruct justice under § 1503, the Government "must establish (1) that [one] defendant (a) knowingly entered into an agreement with another, (b) with knowledge, or at least anticipation, of a pending judicial proceeding, and (c) with the specific intent to impede that proceeding; and (2) the commission of at least one overt act in furtherance of the conspiracy." *Schwarz*, 283 F.3d at 105–06. "[A] judicial proceeding need not be pending at the time the conspiracy began so long as the [defendants] had reason to believe one would begin and one in fact did." *Id.* at 107. Finally, the conduct offered as proof

of the intent to obstruct a federal proceeding must, "in the defendant's mind, [have had] the natural and probable effect of obstructing [the proceeding]." *Id.* at 109 (internal quotation marks omitted).

The leading § 1503 case in this Circuit is *Schwarz*, which arose out of the infamous, in custody abuse of Abner Louima by police officers, who were subsequently tried for, among other things, violating § 1503 by lying to federal investigators.[16] There, the evidence showed that, shortly after Louima was assaulted, the police officer-defendants agreed "generally to impede investigators by putting forth and corroborating a false version of what occurred." *Id.* at 106. During "numerous communications among the [defendants] and others at key points during the investigations, [the defendants] offered parallel accounts that evolved as other evidence in the case surfaced." *Id.*

On appeal, we found that there was sufficient evidence to establish that the defendants had generally agreed to impede the investigation and that at least one of them knew about, or anticipated the existence of, a federal grand jury. *Id.* at 106–07. But we found insufficient evidence that one of the defendants had specifically intended to impede or obstruct the grand jury proceeding. *Id.* at 109. Although the evidence established that this defendant's memo book had been subpoenaed, it did not establish that he knew that the allegedly false statements he had made to federal investigators would be conveyed to the federal grand jury. As we explained, "[h]e may have hoped that they would be provided to the grand jury, and surely there was that possibility; but there was

---

**16.** Because the defendants were prosecuted for lying to federal investigators instead of federal grand jury witnesses, we had no occasion to address the issue discussed above regarding our conclusion in *Masterpol* that charges of lying to, or trying to influence, federal grand jury witnesses should be prosecuted under § 1512.

insufficient evidence to enable a rational trier of fact to conclude that [he] knew that this would happen or that he entertained any expectations on that score that were based on such knowledge." *Id.* (internal quotation marks omitted). "At best, the [G]overnment proved that [he], knowing of the existence of a federal grand jury investigation, lied to federal investigators regarding issues pertinent to the grand jury's investigation." *Id.*

Here, whether the defendants knowingly entered into an agreement to impede a potential grand jury proceeding or to obstruct justice is irrelevant, since the evidence is not sufficient to satisfy either the second or the third elements of a conspiracy to obstruct justice. With respect to the second element—knowledge of a grand jury proceeding—the grand jury was not empaneled until some time in 2000, i.e., six years after the Shootings had occurred and the defendants had agreed not to "tell nobody who did nothing." In contrast, the grand jury in *Schwarz* handed down indictments months after the victim was attacked. *Id.* at 81. Thus, when the defendants in this case agreed in 1994 "that [they] [wouldn't] tell nobody who did nothing," they could not reasonably have foreseen a federal grand jury investigation, especially given that the criminal investigation was being conducted by local police and prosecutors—as it would indeed continue to be for several years after the Shootings occurred.[17]

With regard to the third element, specific intent, the jury certainly was entitled to infer from the evidence that, in 2001, both Fortunato and Cersasulo knew about the grand jury when they spoke with their respective relatives. There is little or no evidence, however, that either Fortunato or Cerasulo specifically intended that the statements they made at that time to their respective relatives would eventually be passed along to the grand jury. Cerasulo testified that, shortly after the Shootings in 1994, Cerasulo told Giuseppe that Cerasulo had not been involved in the shooting of Lombardi. Almost seven years later, in October 2001, FBI agents came to Giuseppe's pizzeria and (in Cerasulo's presence) ·served Giuseppe with a grand jury subpoena and told him that he would be asked questions about Cerasulo's involvement in the Lombardi shooting. In the presence of Giuseppe, the FBI agents then asked Cerasulo about the Lombardi shooting. Cerasulo told them that he had "heard shots . . . [and had run] out." Cerasulo testified that, after 1994, he and Giuseppe "never really talked about" the Lombardi shooting. Moreover, Cerasulo did not testify that he told Giuseppe to lie to the grand jury. Indeed, Cerasulo repeatedly denied ever telling Giuseppe "the truth" about what had happened on the night in question.[18] Thus, Cerasulo's statements to Giuseppe, and to the police in Giuseppe's presence, without more, are legally insufficient to support a conviction for conspiracy to obstruct justice under § 1503. *See Schwarz*, 283 F.3d at 108.

With respect to Michael, the Government also failed to establish that Fortunato specifically intended that the statements he made to Michael would be passed along to the grand jury. First, there was no evidence that, between the time Michael received the grand jury subpoena and the time he testified before the grand jury, Fortunato knew that Michael had received

---

17. Judge Katzmann takes issue with the majority on this point as to the second element, concluding that the modus operandi of individuals involved in organized crime is to assume that anything they say could be used at some point in any variety of legal proceedings, however far down the road.

18. Giuseppe's grand jury testimony was not introduced at trial.

the subpoena. Second, Michael's testimony establishes only that, shortly after he received his grand jury subpoena, he confronted Fortunato about his role in the bank robbery and the Shootings. In response, Fortunato denied any involvement in the robbery and specifically told Michael that he had not seen Lombardi's shooter. And like Cerasulo with Giuseppe, Fortunato never asked Michael to lie to the grand jury. Thus, like Cerasulo's statements to Giuseppe, Fortunato's statements to Michael, standing alone, are legally insufficient to support a conviction under § 1503. *See id.*

Finally, the Government relies heavily on the excerpts from Imbrieco's improperly admitted plea allocution to prove these obstructions of justice. While Imbrieco's plea allocution may have been probative of whether a conspiracy existed in 1994 to obstruct a grand jury investigation and whether a grand jury investigation was foreseeable in 1994, it sheds no light on whether, in 2001, Cerasulo spoke to Giuseppe with the specific intent of obstructing the federal grand jury investigating the Shootings. Indeed, there is nothing in the plea allocution indicating that Imbrieco spoke to Cerasulo about any conversations that Cerasulo may have had with Giuseppe.[19]

### b. *Obstruction–of–Justice Counts*

 The evidence relating to the obstruction of justice was the same evidence that was used to support the convictions for conspiracy to obstruct justice. Thus, the evidence against Fortunato with respect to the obstruction-of-justice count concerning Michael is also legally insufficient. Polito's obstruction-of-justice convictions were premised on a *Pinkerton* theory of liability, as were Fortunato's and Polito's convictions with respect to the grand jury testimony of Giuseppe. As discussed above, in *Pinkerton,* 328 U.S. at 646–48, 66 S.Ct. 1180, the Supreme Court held that "a defendant who does not directly commit a substantive offense may nevertheless be liable if the commission of the offense by a co-conspirator in furtherance of the conspiracy was reasonably foreseeable to the defendant as a consequence of their criminal agreement." *Cephas v. Nash,* 328 F.3d 98, 101 n. 3 (2d Cir.2003). Thus, under *Pinkerton,* a defendant may be found "guilty on a substantive count without specific evidence that he committed the act charged if it is clear that the offense had been committed, that it had been committed in the furtherance of an unlawful conspiracy, and that the defendant was a member of that conspiracy." *United States v. Miley,* 513 F.2d 1191, 1208 (2d Cir.1975).

As discussed above, the evidence that Cerasulo and Fortunato specifically intended to influence the testimony of their respective relatives was legally insufficient

---

**19.** As noted above, Imbrieco's plea allocution only discussed Cerasulo's—and not Fortunato's—attempt to influence a grand jury witness. In Imbrieco's plea allocution, he described an agreement among the defendants in 1994 (as incredible as it seems) to make false statements to the FBI, by answering the following questions in the affirmative:

> [Did] you, Fortunato, Polito, Cerasuolo [sic] or anybody else h[ave] a meeting of the minds, an understanding, that a false statement was going to be made to an FBI agent[?] . . . And also [did] you and one or more of these other people named or anybody else tr[y] to obstruct the due administration of justice[?]
> Did you have such an agreement?
> . . . .
> Is it also true that on or about [November 7, 2001], John Doe [i.e., Giuseppe], who the Grand Jury kn[ew] the identity of, testified before a Grand Jury in this Court[?]
> . . . .
> [Was there] an effort made to influence the testimony of that Grand Jury?

with respect to the conspiracy to obstruct justice; thus neither Polito's nor Fortunato's obstruction-of-justice convictions can be sustained under a *Pinkerton* theory of liability.

### 2. Conspiracy to Make False Statements and Making False Statements

 It is a crime to make "any materially false, fictitious, or fraudulent statement[s] or representation[s]" to an FBI agent. 18 U.S.C. § 1001(a)(2); *see Ballistrea*, 101 F.3d at 834.

#### a. False–Statement Conspiracy

 We find that there would be legally sufficient evidence, had all of that evidence been properly admitted, to satisfy the elements of a conspiracy on the part of Polito and Fortunato to make false statements, as alleged in Count IV. First, Imbrieco's plea allocution established the existence of an agreement among the defendants in 1994 to make false statements to the FBI. As alluded to above, although Imbrieco's plea allocution was improperly admitted, we must consider it as having been properly admitted for the purpose of assessing the legal sufficiency of the evidence to support a criminal conviction.[20] And second, Cerasulo testified that, in 2001, when he was questioned by FBI agents when they served a grand jury subpoena on Giuseppe, Cerasulo denied having been involved in the Shootings.

This testimony would be legally sufficient to establish an overt act in furtherance of the false-statement conspiracy. For the reasons set forth above, however, *see* discussion *infra* Part I, we vacate the false-statement-conspiracy convictions under Count IV, on the ground that Imbrieco's plea allocution was improperly admitted, and remand for a new trial on these charges.

#### b. False–Statement Counts

 Count V charged Polito and Fortunato with making false statements under a *Pinkerton* theory of liability, for the false statements made by Cerasulo to the FBI in 2001 when he denied having been involved in the Shootings. Here, a rational juror could not have concluded that Polito and Fortunato could have reasonably foreseen when they entered into their false-statement conspiracy in 1994 that Cerasulo, as a natural or necessary consequence of their agreement, would make a false statement to an FBI agent in the course of a federal grand jury investigation that was convened six years later. As we explained in *United States v. Jordan*, 927 F.2d 53, 56 (2d Cir.1991), *Pinkerton* did not create "a broad principle of vicarious liability that imposes criminal responsibility upon every co-conspirator for whatever substantive offenses any of their confederates commit." Accordingly, because *Pinkerton* liability does not lie with respect to Cerasulo's

---

**20.** *See Cruz*, 363 F.3d at 197; *United States v. Glenn*, 312 F.3d 58, 67 (2d Cir.2002); *see also Lockhart v. Nelson*, 488 U.S. 33, 39–40, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988); *Burks v. United States*, 437 U.S. 1, 17–18, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *Greene v. Massey*, 437 U.S. 19, 24, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978). Where, "as here, the evidence is determined to be insufficient when the improperly admitted evidence is excluded from the equation but sufficient when the improperly admitted evidence is included in the equation,

the remedy is affected. In such a case, retrial rather than acquittal is the remedy." *Cooper v. McGrath*, 314 F.Supp.2d 967, 999 (N.D.Cal. 2004); *see Lockhart*, 488 U.S. at 39–40, 109 S.Ct. 285; *accord Wigglesworth v. Oregon*, 49 F.3d 578, 582 (9th Cir.1995); *United States v. Chu Kong Yin*, 935 F.2d 990, 1001 (9th Cir. 1991). *Cf. United States v. Aarons*, 718 F.2d 188, 189 (6th Cir.1983) (noting that the sufficiency-of-evidence issue "is determinative of whether the appellant may be retried").

false statements to the FBI, we reverse the convictions relating to the false-statement offenses charged in Count V.

■ Finally, with respect to Count VI, the defendants do not challenge the sufficiency of the evidence relating to their liability for Fortunato's false statements to the FBI. Instead, they argue that we should vacate Count VI and remand for a new trial due to the prejudicial spillover from the evidence admitted with respect to the counts that we have reversed on appeal. We agree.

■ "We look to the totality of the circumstances to assess prejudicial spillover of evidence." *United States v. Naiman,* 211 F.3d 40, 50 (2d Cir.2000). "Specifically we examine: 1) whether the evidence on the [reversed] counts was inflammatory and tended to incite or arouse the jury to convict the defendant[s] on the remaining counts; 2) whether the evidence on the [reversed] counts was similar to or distinct from that required to prove the remaining counts; and 3) the strength of the [G]overnment's case on the remaining counts." *Id.* Here, we conclude that our reversal of the RICO and VCAR convictions also requires that we vacate Fortunato's false-statement conviction "given the enormous amount of prejudicial spillover evidence admitted to prove the RICO enterprise and its extensive criminal activities." *United States v. Tellier,* 83 F.3d 578, 581–82 (2d Cir.1996) (internal quotation marks omitted). Fortunato's false-statement conviction involved a single statement "to which all

but a tiny sliver of the evidence admitted on the RICO charges [was] irrelevant." *Id.* at 582. Thus, it cannot be denied that the spillover prejudice with respect to Count VI was significant. Accordingly, we vacate the convictions relating to Count VI and remand for a new trial on that count.[21]

### III. *Jury Instruction Relating to Authority of District Court to Sentence Cooperating Witness*

Because we are remanding for a new trial with respect to certain of the counts charged in the indictment, we briefly comment on one of the challenges raised by Polito and Fortunato to the District Court's jury instructions, as this issue may arise again in the event of a retrial.[22] Specifically, the defendants argue that the District Court erred in instructing the jury that the court had the authority to sentence cooperating witnesses below the statutory mandatory minimum sentence of life imprisonment without a § 5K1.1 letter from the Government.

The District Court instructed the jury that "the final determination as to the sentence to be imposed rests with the Court, whether or not ... a motion ha[d] been made pursuant to [§ ] 5K1.1 of the [G]uidelines." Specifically, the charge read, in relevant part:

> [Section 5K1.1] provides that upon a motion by the [G]overnment ... stating that a defendant has provided substantial assistance in the investigation or prosecution of another person who has

---

**21.** Polito's liability on this count was based on *Pinkerton.*

**22.** Given our disposition of these appeals, we decline to address the remaining arguments of Polito and Fortunato, that the District Court erred in instructing the jury with respect to: (a) the "position-related motivation" element of 18 U.S.C. § 1959(a); (b) whether

the jury was permitted to draw a negative inference from the fact that Government witnesses had been prepared by the Government's lawyers prior to testifying at trial; and (c) the defense theory that their participation in the Shootings was motivated by personal animosity toward the victims.

been charged with a crime, the court may depart from the [G]uidelines and sentence that person without regard to what the [G]uidelines may require.

There are two factors to be borne in mind in that regard. First, only the [G]overnment can make such a motion. It cannot be compelled to do so; and ... [s]econd, the court has complete discretion as to whether it will or will not grant that motion, and the court is free, in any event, to impose a sentence within the [G]uidelines as it deems appropriate.

In short, the final determination as to the sentence to be imposed rests with the Court, whether or not ... a motion has been made pursuant to [§ ] 5K1.1 of the [G]uidelines.

The clear implication of this instruction was that the District Court had the power to sentence a cooperating witness to less than life imprisonment, even without a § 5K1.1 motion from the Government.[23]

■ Our case law is clear, however, that even when a witness has, in fact, cooperated with the prosecution, a district court is not authorized to depart below a statutory mandatory minimum sentence unless the Government has moved for a downward departure pursuant to U.S.S.G. § 5K1.1. *See, e.g., United States v. Harrison,* 241 F.3d 289, 294 (2d Cir.2001); *see also* 18 U.S.C. § 3553(e). The statutory mandatory minimum sentence for murder in this case was life imprisonment (or death). *See* 18 U.S.C. § 1959(a)(1). Thus, the District Court should not have instructed the jury that it had the authority to depart downward from life imprison-

ment in the absence of a § 5K1.1 letter from the Government. *See United States v. James,* 239 F.3d 120, 126–27 (2d Cir. 2000).

\* \* \* \* \* \*

We have considered the parties' remaining arguments and find them to be without merit.

## CONCLUSION

In sum, for the foregoing reasons, we reverse the convictions under Counts I, II, III, V, VII, and VIII in toto, and the convictions under Count IV for obstruction-of-justice conspiracy. We vacate the convictions under Count IV for false-statement conspiracy and the convictions under Count VI in toto. And we remand for a new trial consistent with this opinion.

---

**23.** The excerpts from the charging conference contained in the appendices make clear that the District Court's jury instruction with respect to this issue arose from its misperception that Bruno, Cerasulo, and D'Urso had been charged with second-degree murder un-

der the generic federal murder statute, which provides that "[w]hoever is guilty of murder in the second degree, shall be imprisoned for any term of years or for life." 18 U.S.C. § 1111(b).