07-2729-cr
USA v. Young

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2008

(Argued: May 12, 2009      Decided: October 8, 2009)

Docket No. 07-2729-cr

- - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,

Appellee,

-v.-                                        07-2729-cr

LAVAL FARMER,

Defendant-Appellant.

- - - - - - - - - - - - - - - - - - - - -x

Before:      JACOBS, Chief Judge, WALKER and LEVAL,
             Circuit Judges.

Defendant-Appellant, Laval Farmer, appeals from a June 22, 2007 judgment of conviction entered in the United States District Court for the Eastern District of New York (Platt, J.). Farmer was convicted by a jury of murder, attempted murder, and conspiracy to assault with a dangerous weapon, in violation of the Violent Crimes in Aid of Racketeering statute, 18 U.S.C. § 1959(a), and of related firearms

offenses under 18 U.S.C. § 924(c).  We reject Farmer's argument that there was insufficient evidence to sustain the convictions, but we conclude that he was denied due process by the prosecutors' gratuitous exploitation of his prejudicial nickname, "Murder."  As a result, Farmer is entitled to a new trial for the attempted murder of Jacquel Patterson, and the related firearms offenses.  We affirm Farmer's convictions for conspiracy to assault with a dangerous weapon and the murder of Jose White, because the strength of the evidence precludes finding substantial prejudice.  Affirmed in part, vacated in part, and remanded.

JEREMY G. EPSTEIN (Seth M. Kean, Grace Lee, Rebecca Boon, Of Counsel, on the brief), Shearman & Sterling LLP, New York, NY, for Defendant-Appellant.

ILENE JAROSLAW, Assistant United States Attorney (Peter A. Norling, Assistant United States Attorney, on the brief), for Benton J. Campbell, United States Attorney for the Eastern District of New York, Brooklyn, NY, for Appellee.

DENNIS JACOBS, Chief Judge:

Laval Farmer was convicted by a jury in the United States District Court for the Eastern District of New York (Platt, J.) of murdering Jose Angel White and attempting to

2

murder Jacquel Patterson "for the purpose of . . . maintaining or increasing [Farmer's] position" within the Bloods street gang, 18 U.S.C. § 1959(a), as well as conspiring to assault with a dangerous weapon and discharging firearms during the murder and the attempted murder. At trial, the government elicited testimony that Farmer's friends and fellow Bloods knew him by the nickname "Murder," an appellation that Farmer had acquired years before and that had little, if any, relevance to any contested issue.

Farmer's nickname, which would be problematical and suggestive in any case involving violent crime, posed a heightened risk of prejudice because the crimes charged included murder and attempted murder. Farmer objected to the use of his nickname in the indictment, and he offered to concede identification to avoid its use at trial. But the government declined Farmer's offer, and the district court admitted the name. Thereafter, the prosecution used the nickname promptly, repeatedly, and in ways calculated to intensify the prejudice.

When a defendant charged with a crime of violence is identified before a jury by a nickname that bespeaks guilt,

violence, or depravity, the potential for prejudice is obvious. Before receiving such evidence over a defendant's objection, a trial court should consider seriously whether the probative value is substantially outweighed by any danger of unfair prejudice, Fed. R. Evid. 403, and whether introduction of the nickname is truly needed to identify the defendant, connect him with the crime, or prove some other matter of significance. Even so, a potentially prejudicial nickname should not be used in a manner beyond the scope of its proper admission that invites unfair prejudice. Federal Rule of Evidence 404(a) provides (with exceptions not applicable here) that "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." It is the ethical obligation of the prosecutor, and the legal obligation of the court, to ensure that this rule is observed.

In this case, the prosecutors, in their addresses to the jury, invited prejudice by repeatedly emphasizing Farmer's nickname in a manner designed to suggest that he was known by his associates as a murderer and that he acted in accordance with that propensity in carrying out the acts

4

charged in the indictment. This abuse of Farmer's nickname entitles Farmer to a new trial for the attempted murder of Patterson and the related firearms offenses. However, we affirm Farmer's convictions for murdering Jose White, discharging a firearm during that offense, and conspiring to assault, because the evidence so overwhelmingly established his guilt respecting those offenses as to nullify any prejudice resulting from the inappropriate argument to the jury.

Farmer also argues that his killing of White, a child on a bicycle wearing the wrong color clothing, was so obviously a mistake that no other intent can be reasonably ascribed to the act, and that his attempted killing of Patterson, another Blood, was so obviously motivated by personal animus that this act likewise cannot reasonably be attributed to an intent to increase Farmer's status as a Blood--an element of the offense. We conclude that the government introduced sufficient evidence that the murder and attempted murder were committed "for the purpose of . . . maintaining or increasing [Farmer's] position in" the Bloods. 18 U.S.C. § 1959(a). This was shown by the Bloods' governance and code, the conversations and conduct of Farmer

and other Bloods at and around the time of the crimes, and Farmer's self-promoting boasts.

Finally, we conclude that Farmer is not entitled to relief on the ground that White's relatives wore T-shirts in the courtroom displaying White's photograph. Accordingly, the judgment of the district court is affirmed in part, vacated in part, and remanded.

# BACKGROUND

## A. The Government's Case

Farmer was convicted for the murder of fourteen-year-old Jose Angel White in Roosevelt, New York on September 23, 2001, and the attempted murder of Jacquel Patterson in Wilkes-Barre, Pennsylvania on July 15, 2002. The indictment charged that these acts came within the scope of § 1959(a) because Farmer committed them "for the purpose of . . . maintaining or increasing" his status in the Bloods street gang, which was a racketeering enterprise. 18 U.S.C. § 1959(a).

## 1. The Bloods

Farmer was a member of the Velt Gangsta Lanes ("VGL") of Roosevelt, New York, on Long Island, a subgroup of the

larger Bloods gang. The VGL was associated with other Bloods subgroups on Long Island.

Aspiring members of the Bloods were required to commit acts of violence to be eligible for membership. Members were initiated by being "blessed in" (vouched for by existing members) or "jumped in" (beaten by five Bloods for 55 seconds).

Bloods operated under a code of loyalty that required members to take on their associates' problems as their own. Disagreements and grievances were resolved through violence, including stabbing or shooting. The leadership of the VGL promoted "gang banging," or beating people up, to "represent the neighborhood."

A member "gain[ed] status" within the gang by "put[ting] in work," which entailed committing acts of violence, including attacking rival gangs. Status was denoted by titles, which ranged upward from "baby gangsta" to "original gangsta," or "OG."

During 2000 and 2001, VGL members met regularly at Centennial Park and in an abandoned house on Hanson Place, both in Roosevelt, New York. Gang members wore specific colors, had gang tattoos, and flashed signs to fellow

7

Bloods.

## 2. Murder of Jose Angel White

On the evening of Saturday, September 22, 2001, VGL members who gathered at Centennial Park learned that two VGL members (Roach and Shoke) had been hit by a car and beaten with baseball bats by members of the rival Crips gang. The VGL members discussed retaliation and dispersed looking for revenge.

Later that evening, Farmer attended a party in Glen Cove, New York with fellow Blood Kashawn Jackson. There, Farmer spoke with Jackson and Gregory Key, another Blood, about the attack on Roach and Shoke. Farmer said that "he knew who did it," and the three agreed to "[t]ake a ride out to Roosevelt, see the guy who did it." Jackson arranged for Melissa Petrizzo, the girlfriend of a Blood, to pick them up in front of a housing project in Glen Cove. Before getting into Petrizzo's car, Farmer asked Key if he "had a burner" (a gun); Key assured him that he did.

Once in Roosevelt, the group stopped near a convenience store where Farmer thought the offending Crips might be, but Farmer and Key did not find them inside. As the two walked back to the car, Farmer asked Key whether he could carry the

8

gun. Key responded, "yeah, but if you use it, you have to pay for it."[1] Farmer took the gun from Key.

Back in the car, Key asked Farmer where a certain Crip lived. Farmer said he knew, but expected only the Crip's mother to be home. Key suggested that they shoot up the house anyway, because he wanted to increase respect for the Bloods and because he needed to repair his status within the gang after having undergone drug rehabilitation in Virginia.

Petrizzo objected and kept driving, until Farmer saw two boys on bicycles, one of them dressed "in all blue" (i.e., color-coded as a Crip). Farmer pointed and said, "there they go right there"; directed Petrizzo to pull over and turn off the lights; and then got out of the car, took a few steps, and fired three shots at the two boys from a distance of approximately five feet. Farmer got back into the car, dropped the gun at Key's feet, and told Petrizzo to drive back to Glen Cove.

As Petrizzo drove away, an ambulance passed going in the other direction. Farmer excitedly proclaimed, "I got those crabs" (Bloods slang for Crips). Petrizzo dubiously

---

[1] Key testified that the gun would be too risky to own if used to kill someone and that he would need to replace it if that happened.

observed that the victim looked like a little boy, but Farmer responded, "[t]hat wasn't a little boy.  I knew who it was."

Later that afternoon, Farmer visited Petrizzo and her Blood boyfriend, boasted that "I got a body," and confirmed to Petrizzo that the victim had died.  Farmer eventually discovered that he had killed Jose White, a popular fourteen-year-old boy who was not a Crip.  After the shooting, Farmer "felt like his name may come up, so he had to get out of town."

**3.  Farmer's Move from New York and Attempted Murder of Jacquel Patterson**

In December 2001, three months after the White shooting, Farmer moved to Wilkes-Barre, Pennsylvania, where he associated with fellow Bloods Damion Russell and Jacquel Patterson.  Russell was a high-ranking "OG" member of the Bloods who had enhanced his status living in California and assumed leadership of the VGL when he returned to New York.  Russell imposed discipline within VGL ranks and imported west-coast traditions.

Farmer told Russell that he had been driving around with Key, Jackson, and Petrizzo looking for "any Crip he could see," and boasted that he had avenged the attack on

10

the Bloods by shooting "a Crips." Russell suggested that Farmer go back to Glen Cove to make sure the gun was destroyed, which Farmer did in December 2001.

In Wilkes-Barre, Farmer and his girlfriend Stacey moved in with Russell, then moved out a few weeks later to live with one of Russell's friends, Khasan Dancy, who had a larger house. Jacquel Patterson and his girlfriend were also living in the house when Farmer moved in. Farmer, Patterson, and Dancy sold crack together.

Farmer's relationship with Patterson developed into hostility. Russell testified that Farmer viewed Patterson as "soft" and "weak." One day, when Dancy and Patterson got into a bar fight with men from Philadelphia, Farmer stabbed one of the Philadelphia men to help out, and became angry when Dancy and Patterson did not back him up or show appreciation. Worse, Patterson expressed the view that the VGL was an illegitimate and inferior Bloods set, to which Farmer and Russell took offense.

In July 2002, Farmer and Patterson bought narcotics from a man named Udi, whom Farmer greeted with the Bloods salute. When Udi brushed off the salute and mocked the VGL set, Farmer objected, Udi drew a gun, and Farmer was forced

11

to stand down. Patterson gloated at Farmer's humiliation. Furious, Farmer visited Patterson's house, punched cabinets, argued, and discharged his gun. After leaving Patterson's house, Farmer called Russell, demanded that he identify himself as a member of the VGL, and told him "that he was sick of [Patterson], that he can't take it no more, and that he was about to give it to [him]."

Farmer and Russell agreed to teach Patterson a lesson and again visited Patterson's house. While Russell waited in the front doorway of the home, Farmer and Patterson walked to Patterson's bedroom. After they entered the bedroom, Patterson's girlfriend, Esther Ross, heard the rapid firing of seven to eight gunshots. During the fussilade, Ross heard Patterson apologize repeatedly and plead for his life. After Patterson stopped pleading, Ross heard two more shots. Patterson suffered gunshot wounds to his body, legs, arms, and face, but survived.

After the shooting, Farmer recounted to Russell that he followed Patterson into the room; that Patterson moved toward the bed, urging Farmer to "hold on"; that Farmer started shooting, while Patterson apologized repeatedly; that when Farmer stopped firing, he found a 9 millimeter

12

pistol under the mattress that Patterson had been approaching; and that Farmer retrieved the pistol and used it to shoot Patterson in the face.  Russell gave Farmer money and arranged for him to flee to New York.

**4.  Farmer's Arrest and Post-Arrest Statements**

Farmer was arrested the day he arrived back in Nassau County, July 16, 2002.  When the police moved in to arrest Farmer, he fled by car, was pulled over, and fled on foot into a house, where he was arrested.  During the arrest, a second group of officers found a 9 millimeter pistol in the car.  Farmer told the Nassau County police that he had just arrived from Virginia, where he had been living with his girlfriend Stacey and doing construction work for the past three or four months,[2] that he did not shoot anybody in Pennsylvania, that he had no role in the White murder, and that he did not know whose pistol was in the car.

On October 31, 2002, Farmer pleaded guilty in state court to possession of the 9 millimeter found in his car at the time of his arrest, which was identified as one of the weapons used in the Patterson shooting.

---

[2] Stacey testified that she never lived in Virginia, and that she and Farmer were living in Wilkes-Barre in the months before his arrest.

**B. The Indictment and Trial**

Farmer was charged in a superseding indictment with: conspiracy to assault with a dangerous weapon in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(6) (Count One); murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1) (Count Two); use of a firearm in connection with murder in aid of racketeering, in violation of 18 U.S.C. § 924(c) (Count Three); attempted murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1) (Count Four); and use of firearms in connection with attempted murder in aid of racketeering, in violation of 18 U.S.C. § 924(c) (Counts Five and Six).

The two-week jury trial started February 7, 2006 and ended February 22, 2006. The government elicited testimony from numerous lay and law enforcement witnesses. Petrizzo testified, pursuant to a cooperation agreement, about driving the car on the night of White's murder, the sequence of events leading up to the crime, and Farmer's inculpatory admissions thereafter. Three Bloods testified pursuant to cooperation agreements: Key, who was in the car with Farmer on the night of White's murder (and who supplied the gun); Russell, whom Farmer associated with in Wilkes-Barre; and

14

Zanne Brown, who was a friend of White and who attended the meeting at Centennial Park on the night of his murder.

Kahiem Seawright, the friend bicycling with White the night he was murdered, testified to seeing a car pull up and turn off its lights before a man wearing a hooded sweatshirt came out, pulled out a gun, and shot White.[3]

Other government witnesses included investigating officers from Nassau County and Wilkes-Barre, emergency services workers, and a ballistics expert.

Farmer called two witnesses. Special Agent James Langtry was questioned about notes from his interview with Key reflecting that Key fired the first shots at White. Farmer's wife, Stacey Farmer, testified about Patterson's jealousy of Farmer's interactions with Patterson's girlfriend--testimony evidently intended to inject a sexual motive into the conflict between Farmer and Patterson, and thereby rebut that Farmer's purpose was to increase his status in the Bloods.

Farmer moved pre-trial to strike references to his nickname "Murder" from the indictment. The district court

---

[3] Key testified that Farmer was wearing a hooded sweatshirt when he committed the murder.

denied the motion, ruling that "if the government's witnesses and one or more material witnesses have identified him to provide a nickname for the name 'Murder' or what have you, they are entitled to use that name in the [i]ndictment for that limited purpose."  The court explained that, to keep the nickname in the indictment, the government would be required to elicit trial testimony from witnesses who knew Farmer by that name.  Farmer then asked that the government avoid referring to him as "Murder" in its questions and that it avoid eliciting testimony in which witnesses might call him "Murder."  Farmer stressed that he was the only defendant on trial, that identity was not at issue, and that he would waive any identification requirement to avoid prejudice from use of his nickname.

The district court initially indicated that it would consider precluding testimony mentioning the name "Murder," but accommodated the government's protest and ruled that "[i]f the witness knows this man by the name of 'Murder' he can so testify."

At trial, several government witnesses testified to knowing Farmer as "Murder" and used the nickname repeatedly in their testimony.  Similarly, the government used the name

16

in its questions and dozens of times in argument to the jury.

On February 22, 2006, Farmer was convicted on all counts.

**C. Sentencing**

On June 20, 2007, Farmer was sentenced principally to two terms of life imprisonment for the murder and attempted murder counts. Farmer was also sentenced to a term of three years' imprisonment on the conspiracy count and consecutive terms of 25 years' imprisonment for the firearms offenses charged in Counts Three, Five, and Six.[4]

**DISCUSSION**

**I**

Farmer challenges the sufficiency of the government's evidence. We must affirm if "'any rational trier of fact could have found the essential elements of the crime beyond

---

[4] The judgment of conviction and sentencing transcript do not specify whether Farmer's sentences on Counts One, Two, and Four are to run consecutively or concurrently. In the absence of an explicit statement from the district court (or a congressional mandate) the sentences on those counts are to run concurrently. See 18 U.S.C. § 3584(a) ("Multiple terms of imprisonment imposed at the same time run concurrently unless the court orders or the statute mandates that the terms are to run consecutively.").

17

a reasonable doubt.'" United States v. MacPherson, 424 F.3d 183, 187 (2d Cir. 2005) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). We "review the evidence in the light most favorable to the government, drawing all reasonable inferences in its favor." United States v. Gaskin, 364 F.3d 438, 459 (2d Cir. 2004).

**A. VICAR Statute**

Farmer was convicted on three counts of violating the Violent Crimes in Aid of Racketeering ("VICAR") statute, 18 U.S.C. § 1959(a), which provides, in relevant part:

> Whoever . . . for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished--
>
> (1) for murder, by death or life imprisonment, or a fine under this title, or both;
>
> * * *
>
> (6) for attempting or conspiring to commit a crime involving maiming, assault with a dangerous weapon, or assault resulting in serious bodily injury, by imprisonment for not more than three years or a fine of under [*sic.*] this title, or both.

18

18 U.S.C. § 1959(a) (emphasis added). Farmer argues that the government failed to prove beyond a reasonable doubt that his "purpose" in shooting White and Patterson was "maintaining or increasing position in" the Bloods, id., the enterprise identified in the indictment.

"Although section 1959(a) does not define the phrase 'for the purpose of . . . maintaining or increasing position in an enterprise,' we interpret that phrase by its plain terms, giving the ordinary meaning to its terms." United States v. Dhinsa, 243 F.3d 635, 671 (2d Cir. 2001) (internal citation omitted). "Webster's defines 'maintain' as to 'preserve from failure or decline' or 'to sustain against opposition or danger,' WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1362 (1993), and increase as 'to become greater in some respect' (listing as examples, size, value, power, authority, reputation and wealth)." Id. Accordingly, "section 1959 encompasses violent crimes intended to preserve the defendant's position in the enterprise or to enhance his reputation and wealth within that enterprise." Id. (emphases omitted).

Dhinsa "broadly interpreted the motive requirement," and "'reject[ed] any suggestion that the 'for the purpose

19

of' element requires the government to prove that maintaining or increasing position in the . . . enterprise was the defendant's sole or principal motive.'" Id. (quoting United States v. Concepcion, 983 F.2d 369, 381 (2d Cir. 1992)). "[T]he motive requirement is satisfied if 'the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership.'" Id. (quoting Concepcion, 983 F.2d at 381); see also United States v. Pimentel, 346 F.3d 285, 295-96 (2d Cir. 2003).

Concepcion, which considered whether a defendant could be liable under § 1959 for shooting someone other than the intended victim, "reject[ed] the suggestion that the government must prove that the victim of the violence was the defendant's intended target," and applied the "well established" principle that "a defendant who planned to murder one person and, in so attempting, killed another is guilty of the murder of the unplanned victim." 983 F.2d at 381. We concluded in Concepcion that

> It was sufficient for the government to prove that [the defendant], as a member of a[n] . . . enterprise engaged in racketeering activity, set out to commit a

proscribed act of violence in order to maintain or increase his position in the enterprise, and that, in the course of so doing, he committed that act against a person who got in his way.

Id. at 382.

For the reasons that follow, we conclude that Farmer's sufficiency challenge is foreclosed by these precedents.

## B. Conspiracy to Assault Rival Gang Members with Dangerous Weapons (Count One)

Farmer argues that the government introduced no evidence of a conspiracy to use dangerous weapons on the night that White was murdered. Although Farmer concedes that he set out with Key and Jackson looking to "beat down" a Crip, he asserts that his fellow Bloods did not anticipate using dangerous weapons in the attack.

The government established that on the night of White's murder, Farmer told Key that "he knew who [attacked their fellow VGL members]," and that the men agreed to "[t]ake a ride out to Roosevelt, [to] see the guy who did it." The verb "see" is surely a euphemism. In any event, before getting into the car, Farmer confirmed that Key had a gun, and the two men entered a corner store, with the gun, looking for Crips to assault.

As they left, Farmer borrowed Key's gun, and Key

21

stipulated that Farmer would have to replace it if he used it.  Upon returning to the car, Key suggested using the gun to shoot up a Crip's house; Farmer instead used the gun to kill White.

Farmer focuses on Key's testimony that Key brought the gun for protection.  But Key could have brought the gun for protection <u>and</u> in anticipation of assaulting a Crip if the need or opportunity presented itself.  Moreover, it is apparent that Key contemplated Farmer's use of the gun, as evidenced by his warning that Farmer would have to replace it if he did.  Based on this evidence, it was reasonable for the jury to conclude that Key and Farmer conspired to assault Crips using Key's gun (a dangerous weapon).

**C.  Murder of Jose White and Discharge of a Firearm During the Offense (Counts Two and Three)**

Farmer argues that the government failed to adduce sufficient evidence to satisfy the VICAR statute's position-related motivation element as to the murder of Jose White.  However, the government introduced substantial evidence that the Bloods deemed an attack against one Blood to be an attack against all, and that Bloods could rise within the gang by defending their peers and committing acts of violence against rival gangs.  By shooting White--whom

22

Farmer believed to be one of the Crips who had attacked Roach and Shoke--Farmer conformed to the expectations of the Bloods enterprise. An exultant Farmer boasted about the crime to his fellow Bloods in the days and months that followed. A reasonable jury could infer from these facts "that [Farmer] committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." Dhinsa, 243 F.3d at 671 (quoting Concepcion, 983 F.2d at 381).

Farmer argues that the government's theory--that he and two friends set off on their own to avenge the attack on Roach and Shoke--was inconsistent with the depiction of the Bloods as a well-organized hierarchy, in which authorization to retaliate would come from superiors. But Farmer cites no evidence that such authorization was required. To the contrary, the evidence showed that Bloods were expected to aid one another without prompting. Moreover, the VGL members jointly agreed to seek revenge at the meeting in Centennial Park on the night of the murder; from that, the

23

jury could infer that the attacks were authorized.[5]

Farmer also argues that killing an innocent fourteen-year-old could not serve the interest of the Bloods, and that his move to Pennsylvania after the crime was evidence that the gang did not condone his actions. In support, Farmer cites United States v. Bruno, 383 F.3d 65, 82-86 (2d Cir. 2004), and United States v. D'Angelo, No. 02-cr-399(JG), 2004 WL 315237, at *1-14 (E.D.N.Y. Feb. 18, 2004), decisions vacating VICAR convictions because of evidence that the killings were against the interests of the defendants' enterprises.

However, the question is not whether Farmer's position in the Bloods was advanced in fact by the murder he committed, but whether his purpose in committing the murder was to benefit his position. We held in Concepcion that a defendant's intent to increase his position in an enterprise can be transferred to an accidental killing. 983 F.2d at 381-82. In this case, there was ample evidence that Farmer intended to kill a Crip (and initially believed he had), and that at least part of his purpose in doing so was to raise

_____

[5] Zanne Brown, a trial witness who attended the meeting in Centennial Park, testified that he went out that night and fired shots at Crips.

24

his status in the Bloods.

Farmer contended at oral argument that notwithstanding Concepcion, the position-related motivation element was not satisfied because the killing was so obviously a mistake that it would be irrational to attribute it to his membership in the Bloods.  But the evidence showed that Farmer shot a teenager wearing a Crip color, where Crips might be found.  The blunder does not alter the intent.

As to Bruno and D'Angelo, neither decision controls this case because the shootings in those cases did not involve mistaken identity.  The defendants in Bruno and D'Angelo intended to shoot (and did shoot) people whose killing could not have enhanced the defendants' status.  See Bruno, 383 F.3d at 82-86; D'Angelo, 2004 WL 315237, at *1-14.  For all of these reasons, we conclude that the government's evidence satisfied the requirement of the VICAR statute that, in killing White, Farmer acted for the purpose of maintaining or increasing his position in a racketeering enterprise.

**D.  Attempted Murder of Jacquel Patterson and Discharge of Firearms During the Offense (Counts Four, Five, and Six)**

Farmer also challenges the sufficiency of the evidence that he shot Patterson to enhance his position in the

25

Bloods.  Although we reject Farmer's argument, the Patterson shooting presents a closer question.

The government argues that Farmer's conflict with Patterson stemmed from Patterson's lack of respect for the VGL, and from Patterson's gloating when Farmer was humiliated by Udi during a drug transaction.  The government posits that Farmer grew tired of these insults and that he shot Patterson to defend the VGL, to repair his reputation after the accidental killing of White, and to further his standing within the set--which is why Farmer took Russell with him as a witness.

As Farmer points out, the indictment charged Farmer with attempting to murder Patterson to increase his status in the Bloods: the government did not charge Farmer with acting to enhance his position in the VGL.  Farmer argues that there was no evidence that shooting Patterson could enhance his standing in the Bloods because an intra-gang shooting would not benefit the larger Bloods enterprise. Farmer points to evidence that Bloods subgroups were often closely allied, and that Bloods were expected to defend--not shoot--one another.

However, the jury was free to credit testimony that

26

members of the Bloods rose in rank within a given set, that actions on behalf of a set could lead to increased status, and that Farmer believed shooting Patterson to defend the VGL could thus enhance his status within the larger Bloods enterprise, the identity of his victim notwithstanding.

Second, Farmer argues that the Patterson shooting was a personal matter, the culmination of months of increasing rancor unconnected to Farmer's standing or membership in the Bloods. However, the government introduced evidence that Farmer's disagreement with Patterson concerned (at least in part) the honor of the VGL set, and that Farmer was enraged by Patterson's contempt for his subgroup. The government was not required to prove that Farmer's "sole or principal motive" was "maintaining or increasing his position," Dhinsa, 243 F.3d at 671 (internal quotation marks omitted), so long as it proved that enhancement of status was among his purposes. The government met that burden.

In sum, we conclude that there was sufficient evidence to sustain the jury's verdict as to all counts, and Farmer's sufficiency challenge is denied.

**II**

27

Farmer challenges the repeated use of his nickname "Murder" in the government's presentation of evidence and argument to the jury.

Farmer moved pre-trial to strike his nickname from the indictment. The district court denied the request, explaining that the government was entitled to include the name if it elicited testimony that witnesses knew Farmer as "Murder." Farmer then asked that the government and its witnesses refer to him as "the defendant." The government opposed the request, and the district court sided with the government. It therefore happened that Farmer was called "Murder" throughout the murder trial, with a lot of arch emphasis and many facetious asides.

For example, in the fourth sentence of her opening statement, the first prosecutor stated that "Laval Farmer, known to everyone by his gangster name as Murder, murdered ninth grader Jose White in cold blood." Moments later, describing the night that White was killed, she explained that "[i]n gang life, if members of another gang mess up members of your gang, the rule is that you retaliate. So, Murder decided that it was time to take out a Crip . . . . Murder was on the warpath." Referring to Farmer's shooting

28

of Patterson, the prosecutor argued that "as you might imagine from what happened eight or nine months before, it wasn't Murder's way to let things go."

In her summation, the second prosecutor asked the jury, "Now, when opening statements began in this case three weeks ago, you must have been saying to yourself: who would do such a thing?  Who would execute a 14-year-old boy simply because he was wearing blue?  Well, allow me to reintroduce you to the defendant.  That would be Mr. Murder.  He would do something like this."  In the climax of the summation, the prosecutor commented that Farmer "really tried to prove himself a real gangster, to come up in the gang.  You know, maybe live up to his name of Murder."

Finally, in her rebuttal to Farmer's closing argument, the first prosecutor used the nickname "Murder" nearly thirty times.  She referred to "Murder . . . on the warpath" the day he shot Patterson, and argued that "[i]n a word, . . . what happened in Pennsylvania was about revenge and power and being a tough gangster.  It [was] about Murder living up to his name and his reputation as a Blood."  The prosecutor closed the government's case by admonishing the jury to "put the responsibility for these crimes where it

belongs; and that is with defendant Laval Farmer, the Blood known as Murder."

We have ruled on challenges to the use of a defendant's nickname in three prior cases. In United States v. Aloi, 511 F.2d 585, 602 (2d Cir. 1975), the prosecution introduced nicknames for several defendants and witnesses, including "Charlie Lamb Chops," "Big Vinny," "Philly Rags," and "Checko Brown." We explained that "although this prosecution practice is to be condemned," we would not presume prejudice, because both the prosecution and defense had used the criminal backgrounds of witnesses to their advantage and because the "epithets occasionally interspersed" throughout an eight-week trial were insufficient to "materially divert[] the attention of the jury." Id. (emphasis added).

In United States v. Burton, 525 F.2d 17, 19 (2d Cir. 1975), we considered use of the nickname "Big Time." In Burton, the defendant's nickname was heard on recorded telephone conversations, and the defendant never moved to strike the nickname from the indictment. Id. We held that "[i]n view of the fact that testimony as to the defendant's nickname was relevant to the government's case and therefore

30

properly before the jury, the prosecutor's occasional reference to the defendant by his nickname during the presentation of the government's case, while certainly not to be encouraged, was not prejudicial and does not require the grant of a new trial." Id. (emphasis added).

More recently, in United States v. Mitchell, 328 F.3d 77, 83-84 (2d Cir. 2003), we considered the government's use of the nickname "Phox." In Mitchell, the government had noted "in summation that Mitchell had 'outfoxed' questions while testifying." Id. at 83 (brackets omitted). We observed that "Mitchell's identity . . . was not at issue in this case, nor did the admission of the nickname directly relate to the proof of the acts alleged. Accordingly, the Government's references were arguably inappropriate." Id. at 84. We held, however, that the "references to Mitchell's nickname were not prejudicial in view of the fact that they were brief and isolated and in light of the substantial evidence of guilt adduced by the government." Id. (emphasis added).

Our decisions in Aloi, Burton, and Mitchell are consistent with precedents in other circuit courts, which have looked to the relevance of the defendant's nickname and

31

the frequency of its use by the prosecution in deciding whether a defendant was prejudiced.  See, e.g., United States v. Candelaria-Silva, 166 F.3d 19, 33 (1st Cir. 1999) (finding no error in including in indictment or admitting testimony of nickname "Macho Gatillo" ("Trigger Man") where nickname was critical to establishing authorship of letter); United States v. Delpit, 94 F.3d 1134, 1146 (8th Cir. 1996) (permitting use of nickname "Monster" where it was not used to "suggest [defendant's] bad character or unsavory proclivities" and where it could not be avoided in wiretaps); United States v. Black, 88 F.3d 678, 681 (8th Cir. 1996) (holding that reference to defendant as "the Jamaican" did not warrant reversal where name was not used in prejudicial manner and confidential informant only knew defendant by that name); United States v. Smith, 918 F.2d 1501, 1511, 1513 (11th Cir. 1990) (affirming conviction where nickname "Boss Man" was introduced as evidence defendant held a supervisory or managerial role in the enterprise whose members called him "Boss Man").

In assessing the propriety of using a defendant's nickname, other courts have also looked to whether the name was "necessarily suggestive of a criminal disposition."

United States v. Dean, 59 F.3d 1479, 1492 (5th Cir. 1995)(holding that the nickname "Crazy K" was "not necessarily suggestive of a criminal disposition"); see also United States v. Jorge-Salon, 734 F.2d 789, 791-92 (11th Cir. 1984) (noting that "[t]he alias . . . 'The Egg,' is similar to the alias 'Red' in Taylor which [that] court observed, 'is no more than a nickname'" (quoting United States v. Taylor, 554 F.2d 200, 203 (5th Cir. 1977)).

In United States v. Williams, the Seventh Circuit vacated a mail-fraud conviction because the prosecution elicited testimony from a police detective that he knew the defendant as "Fast Eddie." 739 F.2d 297, 299-301 (7th Cir. 1984). The court found that "the detective's testimony about the defendant's nickname was completely unrelated to any of the other proof against the defendant," and "[t]he prosecution's only possible purpose in eliciting the testimony was to create an impression in the minds of the jurors that the defendant was known by the police to be an unsavory character or even a criminal." Id. at 300. The prosecution's introduction of the nickname was deemed so prejudicial as to warrant a new trial. Id. at 301; cf. United States v. Clark, 541 F.2d 1016, 1018 (4th Cir. 1976)

33

(per curiam) (holding that where an alias, "though proven, holds no relationship to the acts charged, a motion to strike [the alias from the indictment] may be renewed, the alias stricken and an appropriate instruction given the jury").

In these cases, the suggestiveness of the nickname has not required exclusion, especially when it helped to identify the defendant, connect him to the crime, or prove other relevant matter, or when coherent presentation of the evidence entailed passing reference to it. In determining admissibility, however, the courts also considered whether the nickname's probative value was substantially outweighed by its capacity for unfair prejudice. See Fed. R. Evid. 403; Dean, 59 F.3d at 1491. And even when admission of the nickname was found proper, the courts went on to consider the frequency, context, and character of the use that the prosecution made of it. See Mitchell, 328 F.3d at 83-84; Burton, 525 F.2d at 19; Aloi, 511 F.2d at 602.

In this case, it was error for the district court to permit the government to elicit testimony of Farmer's nickname (except for references by witnesses who know him by that name): identity was not an issue at trial, and Farmer's

34

nickname, as a name, had no legitimate relationship to the crimes charged.[6] Farmer's nickname was strongly "suggestive of a criminal disposition," Dean, 59 F.3d at 1492, and a propensity to commit particularly heinous crimes, including the very offenses charged in the indictment. Federal Rule of Evidence 404(a) prohibits admission of "[e]vidence of a person's character or a trait of character . . . for the purpose of proving action in conformity therewith on a particular occasion." Moreover, the district court's pre-trial ruling imposed no restraint or limitation on the government's use of the nickname.[7] And nothing was done to

[6] Evidence that Farmer was known as "Murder" might have been relevant had he adopted the nickname after killing Jose White to memorialize the crime. But Farmer was called "Murder" long before the White killing: Russell, for example, testified that he knew Farmer as "Murder" in 1998, three years before the White killing. Thus, the nickname had no connection "to the proof of the acts alleged." Mitchell, 328 F.3d at 84.

[7] Because several witnesses knew Farmer only as "Murder," it was probable that the name would be used occasionally, even if only accidentally. Cf. United States v. Hattaway, 740 F.2d 1419, 1425 (7th Cir. 1984) (holding that witness's use of gang nicknames was permissible, where gang members used nicknames in witness's presence and "forbidding [the witness] from using the[] names would have placed an undue burden on her testimony"). Additionally, certain events could only be described with use of the nickname: Russell, for example, testified that when he heard gunshots coming from Patterson's bedroom, he "screamed 'Murder, Murder.'" However, the frequency of the nickname's

35

mitigate prejudice, such as giving a curative instruction.

But the main problem was not the admission of the nickname into evidence.  Rather, it was the prosecutors' frequently repeated, gratuitous invocation of Farmer's nickname in their addresses to the jury, uttered in a context that, in effect, invited the jurors to infer that the defendant had earned the nickname among his gang colleagues as a result of his proclivity to commit murder-- an inference corroborated by the government's evidence that he had yielded to that proclivity in the particular instances being tried.  This is precisely what Rule 404(a) was designed to prevent.

Even so, the misuse and overuse of Farmer's nickname would not lead us to vacate a conviction unless the defendant suffered "substantial prejudice, by so infecting the trial with unfairness as to make the resulting conviction a denial of due process."  United States v. Shareef, 190 F.3d 71, 78 (2d Cir. 1999) (internal quotation marks, citations, and brackets omitted); see also United

---

use in evidence, and the resulting prejudice, as well as the prosecutors' deliberate attempt in summation to use the nickname to imply a proclivity on the defendant's part to commit murder, could have been abated had the district court exercised greater care in its ruling.

States v. Mercado, 573 F.3d 138, 141 (2d Cir. 2009). Moreover, "where, as here, the defendant did not object to the remarks at trial, reversal is warranted only where the remarks amounted to a 'flagrant abuse.'"[8] United States v. Coriaty, 300 F.3d 244, 255 (2d Cir. 2002) (quotation marks and brackets omitted); see also United States v. Rivera, 22 F.3d 430, 437 (2d Cir. 1994).

In our prior cases, the government's use of a defendant's nickname was "occasional," Burton, 525 F.2d at 19; Aloi, 511 F.2d at 602, or "brief and isolated," Mitchell, 328 F.3d at 84. But Farmer's nickname--permitted in a manner that offended Rule 404--was the main rhetorical trope used by the prosecution in its addresses to the jury. This tactical misuse of the nickname, no fewer than thirty times during the rebuttal summation in a presentation that occupies only sixteen transcript pages, amounted to a flagrant abuse.

Did the misuse of the nickname cause Farmer substantial prejudice? One of the relevant considerations is that the

---

[8] Farmer argues that his objection to the admission of his nickname sufficed to preserve his present challenge to the prosecutors' comments. We need not resolve that question, because the prosecutors' remarks "amounted to a 'flagrant abuse.'" Coriaty, 300 F.3d at 255.

district court did nothing to curb the abuse or mitigate the prejudice, despite initially entertaining Farmer's request that the government avoid use of the nickname in its examination of witnesses. See United States v. Feliciano, 223 F.3d 102, 123-24 (2d Cir. 2000). However, the determinative factor here is the weight of the evidence. See id. at 123. Farmer's guilt respecting the White murder and the conspiracy to assault White was supported by such overwhelming evidence that conviction was a certainty. It was therefore not affected by the government's conduct. On the other hand, the evidence supporting Farmer's guilt for the attempted murder of Patterson was far less conclusive.

Both the murder of White and conspiracy to assault White were shown with clarity by multiple witnesses who described in detail the sequence of events before, during, and after White's murder. Key described going with Farmer "to see" the Crips who attacked Roach and Shoke; the murder was obviously a (misguided) act of retaliation. Testimony of the witnesses was strongly supported by Farmer's acts and words after the crime, including his move to Wilkes-Barre and his explanation to Russell as to why he was there. Ample evidence also showed the operation of the Bloods and

38

the role of violence in increasing members' status within the enterprise.  Given the strength of the government's evidence, there can be no doubt that Farmer would have been convicted on Counts One, Two, and Three even if he had no nickname.

However, our confidence does not extend to Farmer's conviction for the attempted murder of Patterson.  Nobody witnessed the shooting or what happened in Patterson's bedroom.  The evidence showed that the two men had an ongoing feud, with hatred and contempt on both sides.  So it was plausible--as Farmer argued to the jury--that Patterson initiated an attack against Farmer in Patterson's bedroom, and that Farmer acted in self-defense.  This was supported by Farmer's account to Russell of Patterson moving toward the bed where the 9 millimeter firearm was located.

Additionally, as discussed in Part I, supra, it is not clear whether Farmer shot Patterson to settle a personal score or to elevate his status within the Bloods enterprise.  Only the latter finding would support a conviction under the VICAR statute; but the government may have short-circuited the jury's fact-finding by repeatedly using Farmer's prejudicial nickname in discussing the Patterson shooting.

39

For example, the government argued that "Murder . . . was the one that was on the warpath that day."  In the government's narrative of the shooting itself, "[o]ut came Murder's 380 pistol . . . .  Murder leaves, leaving J-Rock [Patterson for] dead."  "In a word," the government suggested, "what happened in Pennsylvania was about revenge and power and being a tough gangster.  It [was] about Murder living up to his name and his reputation as a Blood."

The government argues that Farmer could not have suffered prejudice because the crimes were so highly charged and gruesome that the nickname could not have had incremental effect.  This argument is unsound: that the trial evidence was (unavoidably) inflammatory was no reason for the government to raise the temperature in the courtroom by irrelevant sensation.

In sum, Farmer is entitled to a new trial for the Patterson shooting because of the government's misuse of Farmer's nickname, the district court's failure to forestall or mitigate the prejudice, and the arguable strength of Farmer's defenses to the charged offense.  Farmer is not entitled to a new trial for the White murder or conspiracy to assault because there was no substantial prejudice given

40

the certainty of conviction.

Because we are vacating Farmer's attempted-murder conviction, we must also vacate his convictions for the related firearm offenses charged in Counts Five and Six. See United States v. Polanco, 145 F.3d 536, 540 (2d Cir. 1998) (reversing derivative § 924(c) convictions where the underlying conviction was reversed).

## III

Farmer argues that he is entitled to a new trial for the murder of Jose White because White's family members wore T-shirts featuring White's photograph during trial. On the fourth day of trial, defense counsel requested "that nobody be permitted in this courtroom with T-shirts with a picture of Jose White for the jury to see." Counsel explained that he had not noticed the shirts during the first three days of trial, but that he found out when his wife read about them in the newspaper.

Judge Platt responded that he had seen several spectators "[o]ne of the first days" and that it appeared "there was a picture." But he was not sure if jurors had sufficiently good eyesight to see the photographs or if

41

"they would be affected by the picture," because he "couldn't recognize that they had a picture, even with [his] glasses on." As to Farmer's request, Judge Platt opined that "[p]eople are free to walk into a courtroom with whatever they want on their clothing, and I'm reluctant to adopt a different rule." Nonetheless, he "urge[d] the prosecutors to urge them not to come into this courtroom with shirts with pictures."

In Estelle v. Williams, 425 U.S. 501, 505 (1976), the Supreme Court stated that a courtroom practice creating an "unacceptable risk . . . of impermissible factors coming into play" violates due process and the defendant's right to a fair trial. Williams ruled that "the State cannot . . . compel an accused to stand trial before a jury while dressed in identifiable prison clothes." Id. at 512.

In Holbrook v. Flynn, 475 U.S. 560, 562 (1986), the Supreme Court considered whether a defendant's due process rights were violated "when, at his trial with five codefendants, the customary courtroom security force was supplemented by four uniformed state troopers sitting in the first row of the spectator's section." Under Williams, "the question must be . . . whether 'an unacceptable risk is

42

presented of impermissible factors coming into play.'" Id. at 570 (quoting Williams, 425 U.S. at 505). Applying that standard, the augmented presence of police was held not "inherently prejudicial." Id. at 570-72.

The Ninth Circuit applied Williams and Flynn to grant habeas corpus relief because spectators at a rape trial were permitted to wear buttons displaying the message "Women Against Rape." Norris v. Risley, 918 F.2d 828, 831-32 (9th Cir. 1990). The buttons created "an unacceptable risk . . . of impermissible factors coming into play," because they conveyed a message that undermined the defendant's presumption of innocence. Id.

The Ninth Circuit later relied on Norris to hold that a petitioner was "inherently prejudic[ed]" when the victim's family members sat in the front row at trial wearing buttons with the victim's photograph. Musladin v. Lamarque, 427 F.3d 653, 657-58, 661 (9th Cir. 2005), rev'd sub. nom., Carey v. Musladin, 549 U.S. 70 (2006). The court decided that the "buttons essentially 'argue[d]' that [the victim] was the innocent party and that the defendant was necessarily guilty." Id. at 660.

The Supreme Court overruled the Ninth Circuit's

43

decisions in Norris and Musladin v. Lamarque on the ground that no "clearly established" Supreme Court precedent governed displays by trial spectators. See Carey v. Musladin, 549 U.S. 70, 72 (2006). The Court reasoned that Williams and Flynn both involved "state-sponsored courtroom practices," id. at 76, and that the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (codified in scattered sections of 18 U.S.C., 21 U.S.C., 28 U.S.C., and 42 U.S.C.), precluded extending those precedents--on habeas review of a state-court judgment--to displays by private actors, Carey v. Musladin, 549 U.S. at 77. Carey v. Musladin stressed that "the effect on a defendant's fair-trial rights of the spectator conduct to which [defendant] objects is an open question in our jurisprudence." Id. at 76. The Court did not decide that question, but it observed that the Fourth and Ninth Circuits (and state courts) were divided as to whether spectator displays can be "inherently prejudicial." Id. at 76-77.

In light of the Supreme Court's decision in Carey v. Musladin, Farmer's exclusive reliance on Norris is misplaced. Carey v. Musladin, in effect, wiped the slate clean and left it to lower courts to address claims such as

44

Farmer's in the first instance. However, the circumstances of this case do not require us to decide whether courtroom displays by private actors can ever be "inherently prejudicial." Defense counsel did not observe the relatives' T-shirts for three days, the trial judge could not make out the picture, and the imagery and its import only became known because a reporter providing daily coverage of the trial interviewed White's relatives for his story. See, e.g., John Moreno Gonzales, Witness Claims Victim Was in Gang, Newsday, Feb. 10, 2006, at A47. On these facts, we cannot conclude that "what [the jurors] saw was so inherently prejudicial as to pose an unacceptable threat to [the] defendant's right to a fair trial." Flynn, 475 U.S. at 572.

Moreover, once defense counsel called the T-shirts to the district court's attention, the court instructed the government "to urge [Farmer's family] not to come into this courtroom with shirts with the picture." There was no further objection from defense counsel, and there is no indication in the record that the government or Farmer's family ignored the court's request. This intervention fulfilled the obligation of trial judges to "take careful

measures to preserve the decorum of courtrooms." Carey v. Musladin, 549 U.S. at 81 (Kennedy, J., concurring in the judgment). The ameliorative action also distinguishes this case from Norris, 918 F.2d at 829, and Musladin v. Lamarque, 427 F.3d at 655, in which the trial courts did nothing to remove the displays from their courtrooms.

**IV**

Farmer argues that the government introduced expert testimony from Pennsylvania State Trooper Edward Urban without complying with Federal Rule of Criminal Procedure 16(a)(1)(G), which requires the government to provide a written summary of expert testimony in advance of trial. At trial, Urban testified as to bullet trajectories, blood splatter patterns, and shell casings found at the scene of the Patterson shooting. Urban also testified that the evidence at the crime scene in Wilkes-Barre showed the kind of shootout where "one person was doing the shooting" and "one person was being shot." In its summation, the government referred to this statement as Urban's "expert conclusion," and argued that it undermined Farmer's theory of self-defense.

46

Because we are vacating Farmer's conviction for the Patterson shooting, we need not decide whether Urban testified as an expert or whether it was error to admit his testimony without the advanced notice required by Rule 16(a)(1)(G). Farmer is now on notice that if he is retried for attempted murder, the government is likely to elicit testimony from Urban about the crime-scene evidence.

**V**

Farmer argues that his sentence of 25 years' imprisonment for the discharge of a firearm in connection with the White murder exceeds the statutory maximum. "[A]ny person who, during and in relation to any crime of violence . . . uses or carries a firearm . . . shall, in addition to the punishment provided for such crime of violence, . . . (iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years." 18 U.S.C. § 924(c)(1)(A). The statute imposes higher mandatory minimum penalties for defendants with prior § 924(c) convictions, see id. § 924(c)(1)(C); but Farmer's conviction on Count Three was his first under § 924(c). Therefore, the increased penalties did not apply to Count Three.

47

Farmer argues that the ten-year mandatory minimum sentence prescribed by § 924(c)(1)(A)(iii) also constitutes the statutory maximum sentence.  But the statute does not specify a maximum sentence, and in United States v. Johnson, 507 F.3d 793, 798 (2d Cir. 2007), we "h[e]ld that the maximum available sentence under § 924(c)(1)(A) is life imprisonment."  Under Johnson, the district court was permitted to impose a sentence above the ten-year mandatory minimum.[9]

## VI

Farmer, with leave of the Court, submitted a pro se supplemental brief in which he argues that his convictions must be vacated because the Act of June 25, 1948, Pub. L.

---

[9] It appears that Farmer is entitled to resentencing on Count Three in light of United States v. Williams, 558 F.3d 166, 168 (2d Cir. 2009), which held that "the mandatory minimum sentence under Section 924(c)(1)(A) is . . . inapplicable where the defendant is subject to a longer mandatory minimum sentence for a[n] . . . offense that is part of the same criminal transaction or set of operative facts as the firearm offense."  Farmer faced a mandatory life sentence for the White murder, the offense underlying the § 924(c) conviction.  However, Farmer did not raise this issue in his brief or at oral argument, perhaps because the district court's imposition of a 25-year sentence suggests that a remand under Williams would be futile (or because Farmer faces a life sentence in any event).  Accordingly, we decline to reach the issue.

48

No. 80-772, 62 Stat. 683 (codified as amended in scattered sections of 18 U.S.C.), which, <u>inter alia</u>, grants district courts criminal jurisdiction, <u>see</u> 18 U.S.C. § 3231,[10] was not validly enacted by Congress. Farmer contends that the Congressional Record from the date that the Act was passed shows that a quorum was not present, and that the signature of the Speaker of the House of Representatives on the enrolled bill did not cure this deficiency. Farmer also asserts that the legislation is void because the Congressional Record does not describe how members voted on the bill, as required by Article I, Section 7, Clause 2 of the Constitution.[11] This notion has evidently been circulating among inmates in federal correctional institutions, and has been presented in other <u>pro se</u> briefs.

The government argues that even if procedural

---

[10] 18 U.S.C. § 3231 provides, in relevant part, that "[t]he district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States."

[11] Article I, Section 7, Clause 2 provides that after a bill is returned to Congress as a result of a presidential veto, Congress shall reconsider the statute, and "Votes of both Houses shall be determined by Yeas and Nays, and the Names of the Persons voting for and against the Bill shall be entered on the Journal of each House respectively."

49

irregularities tainted the passage of the Act of June 25, 1948 (a point the government vigorously contests), the bill was properly enrolled (signed by the Speaker of the House and President Pro Tempore of the Senate), immunizing it from judicial inquiry into procedural irregularities.

The "enrolled-bill rule" precludes a court from looking beyond the signatures of House and Senate leaders in determining the validity of a statute. The District of Columbia Circuit recently explained the rule thus:

> It is not competent for a party [challenging the validity of a statute] to show, from the journals of either house, from the reports of committees or from other documents printed by authority of Congress, that an enrolled bill differs from that actually passed by Congress. The only evidence upon which a court may act when the issue is made as to whether a bill asserted to have become a law, was or was not passed by Congress is an enrolled act attested to by declaration of the two houses, through their presiding officers. An enrolled bill, thus attested, is conclusive evidence that it was passed by Congress. The enrollment itself is the record, which is conclusive as to what the statute is.

Pub. Citizen v. U.S. Dist. Court for D.C., 486 F.3d 1342, 1349-50 (D.C. Cir. 2007) (internal quotation marks, brackets, and ellipses omitted) (quoting Marshall Field & Co. v. Clark, 143 U.S. 649, 670, 672-73, 675, 680 (1892));

50

see also <u>OneSimpleLoan v. U.S. Sec'y of Educ.</u>, 496 F.3d 197, 203 (2d Cir. 2007) ("[T]he enrolled bill rule 'provides that if a legislative document is authenticated in regular form by the appropriate officials, the courts treat that document as properly adopted.'" (brackets omitted) (quoting <u>United States v. Pabon-Cruz</u>, 391 F.3d 86, 99 (2d Cir. 2004)); <u>United States v. Miles</u>, 244 Fed. App'x 31, 33 (7th Cir. 2007) (order) (relying on enrolled-bill rule to deny challenge to the validity of 18 U.S.C. § 3231); <u>United States v. Chillemi</u>, No. 03-cr-917(PGR)(JRI), No. 07-cv-430(PGR), 2007 WL 2995726, at *6-7 (D. Ariz. Oct. 12, 2007) (same); <u>United States v. Harbin</u>, No. C-01-cr-221(3), No. C-07-cv-260, 2007 WL 2777777, at *5-6 (S.D. Tex. Sept. 21, 2007) (same).

We agree with the government that the enrolled-bill rule precludes Farmer's challenge to the validity of the Act of June 25, 1948, and we hold that the district court properly exercised jurisdiction pursuant to 18 U.S.C. § 3231.

## CONCLUSION

For the foregoing reasons, the judgment of the district

court is affirmed in part, vacated in part, and remanded for a retrial of the attempted murder of Patterson and related firearms offenses.