Garcia, J.
(concurring). This case calls upon the Court to determine the standard applicable to conduct by courtroom spectators that may pose a risk to the defendant’s right to a fair trial. Supreme Court decisions in this area have left us with a “clean slate” upon which to write such a rule (see United States v Farmer, 583 F3d 131, 149 [2009], cert denied 559 US 1058 [2010]).
I concur with the majority that defendant was not deprived of a fair trial. I write separately because I would adopt the standard the Supreme Court applies to state-sponsored courtroom practices that raise similar issues instead of the abuse of discretion standard applied by the majority (see majority op at 369-370). Under this standard, appellate courts would examine the totality of the circumstances to determine whether the spectator conduct at issue presents “an unacceptable risk ... of impermissible factors coming into play” (Holbrook v Flynn, 475 US 560, 570 [1986] [internal quotation marks and citation omitted]). The majority’s approach is thoughtful and, as it applies to these facts, correctly focuses on the trial court’s failure to take remedial measures. An abuse of discretion standard may lead, however, to inconsistent rulings by trial courts and permits harmless error analysis by appellate courts even though spectator conduct may implicate a defendant’s “self-standing” right to a fair trial (People v Crimmins, 36 NY2d 230, 238 [1975]).
The law with respect to courtroom conduct by state actors is clear. In several habeas corpus proceedings, the Supreme Court *374 considered whether such conduct in the courtroom led to a defendant being deprived of a fair trial. In Estelle v Williams (425 US 501 [1976]), the Court confronted a defendant’s claim that he was “compell[ed] ... to stand trial in jail garb” (id. at 505). Holbrook v Flynn involved a jury trial where four uniformed law enforcement officers sat “in the first row of the spectators’ section,” ostensibly for security purposes (475 US at 562). The Court’s analysis in both cases was grounded in the presumption of innocence:
“The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice. . . .
“To implement the presumption, courts must be alert to factors that may undermine the fairness of the fact-finding process. In the administration of criminal justice, courts must carefully guard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt” (Williams, 425 US at 503 [citation omitted]).
Certain conduct, the Supreme Court found, was so inherently prejudicial that it denied the defendant a fair trial. In analyzing whether that constitutional violation had taken place, the Court explained “the question must be not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether ‘an unacceptable risk is presented of impermissible factors coming into play’ ” (Flynn, 475 US at 570, quoting Williams, 425 US at 505).
Also common in Flynn and Williams was the fact that conduct complained of was perpetrated by state actors, namely, prison or law enforcement officials. A subsequent habeas corpus proceeding, however, involving spectator conduct — trial attendees wearing buttons with the victim’s photograph — did reach the Supreme Court, but the issue of what standard should apply to evaluate that conduct was not addressed because of the procedural posture of the case (see Carey v Musladin, 549 US 70, 76 [2006]). The Court explained it “ha[d] never addressed a claim that such private-actor courtroom conduct was so inherently prejudicial that it deprived a defendant of a fair trial” (id. [footnote omitted]). As a result, the Court determined that the conclusion of the state appellate court in *375 the defendant’s underlying criminal action was not “contrary to or an unreasonable application of clearly established federal law as determined by this Court” as required for federal habeas relief (id. at 77; see Farmer, 583 F3d at 149-150 [“Carey v. Musladin . . . left it to lower courts to address claims” based upon “courtroom displays by private actors”]).
Concurring in the judgment in Musladin, Justice Souter asserted that Williams and Flynn evinced an “intent to adopt a standard at [a] general and comprehensive level . . . that . . . reaches the behavior of spectators” (Musladin, 549 US at 82 [Souter, J., concurring]; see also id. at 78-79 [Stevens, J., concurring]). I agree, and would apply the Williams/Flynn standard here.
As the Musladin majority noted, the inquiry in Williams and Flynn asked “whether the practices furthered an essential state interest,” suggesting the standard “applied] only to state-sponsored practices” (id. at 76). Certainly, the question of state interest is a factor with no relevance to the facts and circumstances here. Nevertheless, as Justice Souter concluded, the trial court “has an affirmative obligation to control the courtroom and keep it free of improper influence” whether the improper conduct is by. a state actor “or an individual” (id. at 82 [Souter, J., concurring]).
Accordingly, with respect to conduct of private actors in the courtroom, the same standard should apply to answer the critical question of whether the spectator conduct presented “ ‘an unacceptable risk ... of impermissible factors coming into play’ ” (id. at 75 [citation omitted]).
Answering that question, as the Supreme Court observed in Williams, is challenging:
“The actual impact of a particular practice on the judgment of jurors cannot always be fully determined. But this Court has left no doubt that the probability of deleterious effects on fundamental rights calls for close judicial scrutiny. Courts must do the best they can to evaluate the likely effects of a particular procedure, based on reason, principle, and common human experience” (425 US at 504 [citations omitted]).
Three factors appear most relevant when assessing the prejudicial effect of the conduct at issue. First, courts should examine the nature of the conduct or display and its potential *376 to influence the jury verdict (see e.g. Woods v Dugger, 923 F2d 1454, 1458-1460 [11th Cir 1991] [considering prejudice from presence of uniformed off-duty prison guards attending, as spectators, the trial of the defendant for murder of a guard]; State v Allen, 182 Wash 2d 364, 385-386, 341 P3d 268, 278-279 [2015] [“Silent showings of sympathy or support do not pose an unacceptable threat to the defendant’s right to a fair trial so long as the display does not advocate for guilt or innocence”]; People v King, 215 Mich App 301, 305, 544 NW2d 765, 768 [1996] [“We are not persuaded . . . that the wearing of the buttons, which were less than three inches in diameter, . . . could have influenced the panel”]). Second, appellate courts must consider whether the record of the courtroom situation is adequate to facilitate review (see e.g. State v Iromuanya, 282 Neb 798, 823, 806 NW2d 404, 429 [2011]; State v Speed, 265 Kan 26, 48, 961 P2d 13, 29-30 [1998]; Nguyen u State, 977 SW2d 450, 457 [Tex Ct App 1998], affd on other grounds 1 SW3d 694 [Tex Crim App 1999]). Third, and not necessarily determinative, appellate courts should consider the response, if any, by the trial court to the conduct (see e.g. Farmer, 583 F3d at 150 [“Moreover, once defense counsel called the T-shirts to the district court’s attention, the court instructed the government ‘to urge (the spectators) not to come into this courtroom with shirts with the picture’ ”]; People v Houston, 130 Cal App 4th 279, 316, 29 Cal Rptr 3d 818, 848 [2005]; State v Franklin, 174 W Va 469, 475, 327 SE2d 449, 455 [1985]).
Applying the first factor, the offending shirts in this case bore the victim’s photograph and the phrase “Remembering Leo Walton.” Such images could “raise a risk of improper considerations” inasmuch as the photograph and written message could be construed as “an appeal for sympathy . . . and a call for some response” that a juror might interpret to mean “a verdict of guilty” (Musladin, 549 US at 82-83 [Souter, J., concurring]; see generally People v Stevens, 76 NY2d 833, 835 [1990] [“photographs of the victim taken while he or she was alive . . . may . . . arouse the jury’s emotions”]). As other courts confronted with similar displays have noted, however, jurors were just as “likely to have viewed the buttons as signs of grief instead of a collective call for . . . conviction” (Iromuanya, 282 Neb at 828, 806 NW2d at 432). The spectators were silent, evidently few in number, and their T-shirts were partially covered. Moreover, unlike the wearing of law enforcement uniforms by persons in the gallery, these T-shirts gave no suggestion of state approval of the spectator’s message (cf. *377 Woods, 923 F2d at 1458-1460 [noting “(a)bout half of the spectators appear to be wearing prison guard uniforms” and “(t)he officers in this case were there ... to communicate a message to the jury” even though “no state interest c(ould) justify the uniformed presence of these off-duty correctional officers” (footnotes omitted)]).
Next, the limited record makes the potential impact of the conduct more difficult to assess. Defense counsel apparently did not notice the shirts at first, and we are left with the trial court’s brief description of the T-shirts and somewhat inconsistent recounting of the spectators’ conduct in court. At summation, upon consideration of defense counsel’s and the prosecutor’s arguments, the trial court determined the conduct was not prejudicial, explaining his reasons on the record. Thereafter, at the CPL 330.30 hearing, the court clarified the record before us:
“the jury was not inflamed by the simple wearing of the [T]-shirts by members of the decedent’s family. They sat in the second row of the audience. I noticed one of the grieving members of the family wearing the shirt . . . several times.
“I guess now it would be appropriate [for me] to make a better record of what the shirt was. It was [a] white [T-shirt] with a silk screen with a picture of the deceased with some written language on it.
“I had noticed that shirt, [but] couldn’t read what was written on it. It was not flauntily displayed in front of the jury, nor in any way did any members of the family bring undue attention to it.
“In fact, most of the members of the family had an outer garment on top of the [T]-shirt. So it wasn’t even capable of seeing the entire thing.”
We know nothing about how well, if at all, the jury could see the T-shirts. Moreover, only four people wore the shirts, which does not on this record amount to “a formidable, albeit passive, influence on the jury” (Franklin, 174 W Va at 474-475, 327 SE2d at 454-455 [noting “from ten to thirty MADD demonstrators remained in court throughout the trial” for an alcohol-related vehicular homicide “and sat directly in front of the jury. Some cradled sleeping infants in their laps and all prominently displayed their MADD buttons”]).
*378 Lastly, I agree with my colleagues that “[t]rial courts have the inherent authority and the affirmative obligation to control conduct and decorum in the courtroom, in order to promote the fair administration of justice for all” (majority op at 367). Unquestionably, the better practice here would have been for Supreme Court to have responded to the spectator conduct by taking steps to end the display, but I cannot agree that all spectator displays of a deceased victim’s photograph should be banned outright (see majority op at 370-371). This is not to say that any particular memorial or other display by spectators is permissible, or that certain conduct necessitates a specific response. The risk of prejudice presented by spectator conduct should always be evaluated on a case-by-case basis (see Musladin, 549 US at 83 [Souter, J., concurring]; Iromuanya, 282 Neb at 827, 806 NW2d at 432 [noting that Justice Souter “declined to embrace a per se rule” regarding memorial buttons and instead concluded that the issue in each case is whether the risk is unacceptable]).
In sum, after considering the nature of the conduct and the record presented, and factoring in the trial court’s response, or rather lack thereof, to the conduct, there is no reasonable probability that the conduct by the spectators created an unacceptable risk to defendant’s right to a fair trial. The spectators’ silent display was not overwhelming and seemed to be in the nature of an expression of sympathy, not a play to the passion of the jury. Expressions of grief by a decedent’s family members and loved ones are to be expected — though not necessarily tolerated — during a homicide trial. Trial courts should continue to take measures to address the risks of such conduct and avoid even the suggestion that improper factors may have influenced the jury (see e.g. People v Pennisi, 149 Misc 2d 36, 37, 40 [Sup Ct, Queens County 1990] [trial court determined that ribbon corsages worn by family members of victim and other spectators could not be worn in the courtroom]). Nevertheless, the court’s failure to respond here, while not optimal, is not sufficient grounds for a new trial.
Chief Judge DiFiore and Judges Abdus-Saeaam and Stein concur; Judge Garcia concurs in result in an opinion, in which Judges Pigott and Rivera concur.
Order affirmed.